Maurice B. VerStandig, Esq.
*Pro Hac Vice Forthcoming*
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
Telephone: 301-444-4600
Facsimile: 301-576-6885
E-mail: mac@mbvesq.com
*Counsel for the Plaintiffs*

Kelly Minkin, Esq.
*Pro Hac Vice Forthcoming*
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
Telephone: 301-444-4600
Facsimile: 301-576-6885
E-mail: kelly@mbvesq.com
*Counsel for the Plaintiffs*

William H. Pillsbury, Esq.
*Pro Hac Vice Forthcoming*
Law Offices of William H. Pillsbury PLLC
3959 Welsh Road #333
Willow Grove, Pennsylvania 19090
Telephone: 267-518-3445
wpillsbury@whplawoffices.com
*Counsel for the Plaintiffs*

Julian K. Bach, Esq.
California Bar No. 162421
Law Offices of Julian Bach
7911 Warner Avenue
Huntington Beach, California 92647
Telephone: 714-848-5085
Facsimile: 714-848-5086
E-mail: julian@jbachlaw.com
*Designated Counsel Pursuant to Local Rule 180(b)(2)(ii)*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

COMPLAINT AND DEMAND FOR TRIAL BY JURY - 1

| | |
|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9 | VERONICA BRILL; KASEY LYN MILLS;<br>MARC GOONE; NAVROOP SHERGILL;<br>JASON SCOTT; AZAAN NAGRA; ELI<br>JAMES; PHUONG PHAN; JEFFREY<br>SLUZINSKI; HARLAN KARNOFSKY;<br>NATHAN PELKEY; MATT HOLTZCLAW;<br>JON TUROVITZ; ROBERT YOUNG; BLAKE<br>ALEXANDER KRAFT; JAMAN YONN<br>BURTON; MICHAEL ROJAS; HAWNLAY<br>SWEN; THOMAS MORRIS III; PAUL<br>LOPEZ; ROLANDO CAO; BENJAMIN<br>JACKSON; HUNG SAM; COREY CASPERS;<br>ADAM DUONG |

1   VERONICA BRILL; KASEY LYN MILLS;    Case No.:
2   MARC GOONE; NAVROOP SHERGILL;
    JASON SCOTT; AZAAN NAGRA; ELI
3   JAMES; PHUONG PHAN; JEFFREY          COMPLAINT AND DEMAND FOR TRIAL
    SLUZINSKI; HARLAN KARNOFSKY;         BY JURY
4   NATHAN PELKEY; MATT HOLTZCLAW;
5   JON TUROVITZ; ROBERT YOUNG; BLAKE    CAUSES OF ACTION:
    ALEXANDER KRAFT; JAMAN YONN          1.   VIOLATION OF THE RACKETEER
6   BURTON; MICHAEL ROJAS; HAWNLAY       INFLUENCED CORRUPT ORGANIZATION
    SWEN; THOMAS MORRIS III; PAUL        ACT AS CODIFIED AT SECTION 1962(C)
7   LOPEZ; ROLANDO CAO; BENJAMIN         OF TITLE 18 OF THE UNITED STATES
8   JACKSON; HUNG SAM; COREY CASPERS;    CODE
    ADAM DUONG                           2.   FRAUD
9                                        3.   NEGLIGENT MISREPRESENTATION
              Plaintiffs,                4.   NEGLIGENCE PER SE
10                                       5.   UNJUST ENRICHMENT
                                         6.   NEGLIGENCE
11  vs.                                  7.   CONSTRUCTIVE FRAUD
                                         8.   FRAUD
12  MICHAEL L. POSTLE; KING'S CASINO,    9.   LIBEL
    LLC D/B/A STONES GAMBLING HALL;
13  JUSTIN F. KURAITIS; JOHN DOES 1-10;
    JANE DOES 1-10
14

15

16          Come now Veronica Brill ("Ms. Brill"), Kasey Lyn Mills ("Ms. Mills"); Marc Goone

17  ("Mr. Goone"), Navroop Shergill ("Mr. Shergill"); Jason Scott ("Mr. Scott"); Azaan Nagra ("Mr.

18  Nagra"); Eli James ("Mr. James"); Phuong Phan ("Mr. Phan"); Jeffrey Sluzinski ("Mr.

19  Sluzinski"), Harlan Karnofsky ("Mr. Karnofsky"); Nathan Pelkey ("Mr. Pelkey"); Matt

20  Holtzclaw ("Mr. Holtzclaw"); Jon Turovitz ("Mr. Turovitz"); Robert Young ("Mr. Young");

21
22  Blake Alexander Kraft ("Mr. Kraft"); Jaman Yonn Burton ("Mr. Burton"); Michael Rojas ("Mr.

23  Rojas"); Hawnlay Swen ("Mr. Swen"); Thomas Morris III ("Mr. Morris"); Paul Lopez ("Mr.

24  Lopez"); Rolando Cao ("Mr. Cao"); Benjamin Jackson ("Mr. Jackson"); Hung Sam ("Mr.

25  Sam"); Corey Caspers ("Mr. Caspers"); and Adam Duong ("Mr. Duong") (collectively, the

26
27  "Plaintiffs," with each sometimes being known as a "Plaintiff"), by and through counsel, The

28  VerStandig Law Firm, LLC, and as and for their complaint (the "Complaint") against Michael L.

COMPLAINT AND DEMAND FOR TRIAL BY JURY - 2

Postle ("Mr. Postle"), King's Casino, LLC d/b/a Stones Gambling Hall ("Stones"), Justin F.

Kuraitis ("Mr. Kuraitis"), John Does 1-10 and Jane Does 1-10 (Mr. Postle, Stones, Mr. Kuraitis,

John Does 1-10, and Jane Does 1-10 being collectively known as the "Defendants," and each

sometimes being known as a "Defendant") state as follows:

**Introduction**

1.      This case concerns Mr. Postle's systematic use of one or more electronic devices,

for purposes of cheating, while playing in broadcast games of poker, to steal hundreds of

thousands of dollars from fellow players.

2.      All poker games at issue herein occurred at Stones' eponymous facility in Citrus

Heights, California; as concerns and suspicions about Mr. Postle's cheating were repeatedly

brought to Stones' management, the casino operator habitually sought to downplay such

concerns while simultaneously promoting Mr. Postle as an idiosyncratically gifted individual

imbued with poker skills so immense as to be incomprehensible to the average person.

3.      When Ms. Brill made public her concerns of cheating, in late September 2019,

Stones initially responded by indicating her observations to be "completely fabricated;" only

after the *ad hoc* poker community proceeded to investigate such allegations in myriad public

forums, and confirmed Mr. Postle to be engaged in demonstrative cheating, did Stones announce

a new investigation to be underway by an "independent" third party who, in actuality, is Stones'

own legal counsel.

4.      As extrapolated upon *infra*, this case represents the single largest known cheating

scandal in the history of broadcast poker, emanates from a series of events that have rocked the

poker community, is brought with hopes the discovery process will reveal why Stones appears to

COMPLAINT AND DEMAND FOR TRIAL BY JURY - 3

have perpetually covered up for Mr. Postle, and is filed with the aim of bringing redress to the numerous individuals victimized by Mr. Postle and his confederate(s).

**Parties**

5.      Ms. Brill is a natural person who is a citizen of Canada and domiciliary of the State of California, in which she legally resides.

6.      Ms. Mills is a natural person who is a citizen of the State of Texas by virtue of her ongoing domicile therein.

7.      Mr. Goone is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

8.      Mr. Shergill is a natural person who is a citizen of Canada.

9.      Mr. Scott is a natural person who is a citizen of the State of New Hampshire by virtue of his ongoing domicile therein.

10.      Mr. Nagra is a natural person who is a citizen of the State of Nevada by virtue of his ongoing domicile therein.

11.      Mr. James is a natural person who is a citizen of the State of Nevada by virtue of his ongoing domicile therein.

12.      Mr. Phan is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

13.      Mr. Sluzinski is a natural person who is a citizen of the State of Nevada by virtue of his ongoing domicile therein.

14.      Mr. Karnofsky is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

COMPLAINT AND DEMAND FOR TRIAL BY JURY - 4

15.     Mr. Pelkey is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

16.     Mr. Holtzclaw is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

17.     Mr. Turovitz is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

18.     Mr. Young is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

19.     Mr. Kraft is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

20.     Mr. Burton is a natural person who is a citizen of the State of Missouri by virtue of his ongoing domicile therein.

21.     Mr. Rojas is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

22.     Mr. Swen is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

23.     Mr. Morris is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

24.     Mr. Lopez is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

25.     Mr. Cao is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

COMPLAINT AND DEMAND FOR TRIAL BY JURY - 5

26.     Mr. Jackson is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

27.     Mr. Sam is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

28.     Mr. Caspers is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

29.     Mr. Duong is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

30.     Mr. Postle is a natural person who, upon information and belief, is a citizen of the State of California by virtue of his ongoing domicile therein.

31.     Stones is a limited liability company formed pursuant to the laws of the State of Delaware, with a principle place of business in the State of California; the membership of Stones is not known to the Plaintiffs as of the filing of this Complaint but it is anticipated such will be learned in discovery to the extent relevant to this case.

32.     Mr. Kuraitis is a natural person who, upon information and belief, is a citizen of the State of California by virtue of his ongoing domicile therein.

33.     John Does 1-10 and Jane Does 1-10 are persons, natural and/or legal, who (i) conspired with Mr. Postle to cheat at the game of poker through one or more electronic instrumentalities; (ii) aided Mr. Postle in cheating at the game of poker; (iii) worked to conceal Mr. Postle's cheating from discovery by third parties; (iv) were charged with monitoring Stones' eponymous card room for cheating activity and failed to do so; (v) suppressed allegations of Mr. Postle's cheating, leading to the continuation of his tortious conduct; (vi) installed or implemented electronic devices to be utilized by Mr. Postle while cheating at games of poker;

(vii) altered broadcast graphics so as to make Mr. Postle's cheating behavior less evident to viewers and the public at large; and/or (viii) aided Mr. Postle in structuring monetary transactions so as to avoid tax reporting requirements. The Plaintiffs have a good faith basis upon which to allege the identity of the person who is John Doe 1, being an individual who directly aided Mr. Postle in cheating by aiding in the concealment of such behavior with knowledge and scienter, and have directed a litigation hold letter to such person. The Plaintiffs, however, are cognizantly refraining from making such allegation against this particular Defendant herein until greater information can be gleaned through the discovery process, in recognition of the sensitivity of making such an allegation. If necessary to conform with the pleading standards of this Honorable Court, however, the Plaintiffs are prepared to amend this Complaint and identify John Doe 1 by his legal name, without the aid of discovery, and do further note that their pre-filing investigation of the facts of this case furnishes them with a sufficient basis to do so; their election to not do so at this time is solely derivative of a desire to be more cautious than required, given the gravity of this matter.

### Jurisdiction and Venue

34.     This Honorable Court enjoys jurisdiction over the matter *sub judice* pursuant to the allowances of Section 1331 of Title 28 of the United States Code, as this case involves a claim for relief arising under the Racketeer Influenced Corrupt Organization Act codified at Section 1961, *et seq.* of Title 18 of the United States Code.

35.     This Honorable Court enjoys supplemental jurisdiction over the state and common law claims set forth herein, pursuant to the allowances of Section 1367(a) of Title 28 of the United States Code, as the first cause of action enumerated herein furnishes this Honorable Court with original jurisdiction as alleged *supra*.

36.     Inasmuch as the damages sought herein exceed Five Million Dollars and No Cents ($5,000,000.00), should there be an infirmity in the federal question raised herein, the Plaintiffs are prepared to amend this Complaint to assert their claims on behalf of themselves and all others similarly situated, and thus invoke this Honorable Court's jurisdiction pursuant to the allowances of Section 1332(d)(2) of Title 28 of the United States Code.

37.     Venue is properly laid in this Honorable Court pursuant to the allowances of Section 1391(b)(2) of Title 28 of the United States Code, as the events complained of herein occurred within Citrus Heights, California, being within a county enumerated in Section 84(b) of Title 28 of the United States Code.

**General Allegations: Stones Live Poker**

38.     In or about July 2014, Stones opened a casino in Citrus Heights, California (the "Casino"), in which the majority of gaming space is dedicated to a poker room.

39.     As a means of promoting the Casino, attracting more lucrative poker games to the Casino, and giving the Casino the aura and ambiance of a "destination," Stones installed a single poker table imbedded with radio-frequency identification ("RFID") capabilities, procured playing cards containing RFID censors, and installed various motion picture cameras around the subject poker table (the "RFID Table").

40.     While games of poker are traditionally played in a manner that at least some of each respective player's cards are concealed from everyone except that individual player (the "Hole Cards"), the RFID Table introduced the ability of Stones to transmit – in real time – the identity of each player's Hole Cards to a control room, where such information can be utilized to produce a broadcast of the subject poker game to the public at large.

41.     The phenomenon of broadcasting poker games where the public is able to see players' Hole Cards is neither new nor novel; this has been an emerging trend in the poker industry for much of the past few decades, and one that has allowed television and internet content producers to create more dramatic, appealing programs, by satisfying the desire of viewers to assume an omniscient posture while consuming poker programming.

42.     To avoid the precise variety of cheating evidenced in this case, most purveyors of RFID technology in live poker games feed the information – through one or more encrypted channels – to a separate control room, away from the physical area in which the poker game is being played, and then have the control room produce the broadcast on a delay of typically fifteen (15) to thirty (30) minutes.

43.     Other operators of RFID-enabled poker games – such as the World Series of Poker and the Bicycle Casino in Bell Gardens, California – take extensive steps to ensure the security of players' Hole Cards, so as to protect the integrity of the poker games being broadcast, to entice reputable poker players to participate in such games, and to avoid enabling the sort of rampant criminality alleged in this Complaint.

44.     Stones uses its RFID Table to broadcast "live" poker games (typically on a delay, as discussed *supra*) several nights a week, airing such games on various internet platforms and publicizing such games as "Stones Live Poker."

45.     When Stones utilizes its RFID Table to broadcast poker games, it has one or more persons offer live commentary on the subject game from a booth within the Stones poker room (the "Commentator," defined in the singular even though it is often embodied in the plural).

46.     The Commentator does *not* view RFID information and players' Hole Cards in real time but, rather, watches the produced stream on the same taped delay as the public, and commentates by watching the already-produced visual stream.

47.     Stones Live Poker operated from at least January 2016 until the week prior to the bringing of this Complaint, when the operation was suspended in light of the scandal giving rise to this case.

48.     At all times relevant, Stones Live Poker has been controlled, *en toto*, by Stones and its agents.

49.     From at least 2018 through the present, Mr. Kuraitis – an employee of Stones – has been the director of Stones Live Poker and has been responsible for its production and operation including, *inter alia*, its security.

**General Allegations: Cheating**

50.     Mr. Postle has been a regular and habitual participant in Stones Live Poker games during a period of time commencing in or before January 2018.

51.     While playing in Stones Live Poker games, Mr. Postle has won more money than any other participant, in total, and has oftentimes been the winningest player on the show on any given night in which he is a participant.

52.     Mr. Postle's winnings on the Stones Live Poker broadcast, and his correlative play of poker, have been so exceptionally outstanding as to lead the Commentator to note his seemingly mystical abilities on numerous occasions, and to lead Stones Like Poker to produce various graphics portraying Mr. Postle as a deity-like individual imbued with omniscient powers (with one such graphic conflating an image of Mr. Postle and an image of Jesus Christ).

53.     These winnings and this aura were brought about by Mr. Postle's peculiar ability to make a situationally-optimal decision in almost every situation with which he was confronted while playing on Stones Live Poker from July 2018 onward.

54.     This optimal decision making was so precise as to allow Mr. Postle to record net winnings in more than ninety four percent (94%) of the Stones Live Poker games in which he played from July 18, 2018 onward, even though such games are of fixed duration and elevated variance (relative to "normal" poker games); such a winning percentage, under these confined circumstances in a streamed environment, is not known to have been achieved by any other poker player – professional or amateur – over such a significant period of time.

55.     This optimal decision making was also so precise as to allow Mr. Postle to record an average profit of more than sixty (60) "big blinds per hour" (a metric used by professional poker player to track winnings, adjusting for the different stakes of various games); by contrast, it is generally noted in poker circles five (5) big blinds per hour is a goal for which one should aspire, ten (10) big blinds per hour is exceptional, and anything more than twenty five (25) big blinds per hour is stratospherically phenomenal over any appreciable period of time due to the high presence of chance in games of poker and the inherent skill of other players.

56.     A detailed review of Mr. Postle's play reveals not only statistics unfathomable in the world of professional poker but, too, situation-specific decision making in which almost every so-called "guess" to be made by Mr. Postle is done so in a manner that optimally benefits his monetary interest.

57.     Analytical observation reveals Mr. Postle's exponential winnings cannot be explained through finely-honed abilities to "read" opponents, as myriad optimal plays made by Mr. Postle required not merely an analysis of his opponent's self-perceived strength or weakness

in a poker hand but, rather, the precise composition of such hand; while such may be anecdotally attributed to guess work in a vacuum, Mr. Postle was continuously correct in making such assessments over a period of time in excess of a full year.

58.     In short, Mr. Postle's poker winnings – considered in the prism of both metrics and hand-for-hand decision-making – on Stones Live Poker have been not merely outliers but, in fact, exponential outliers, representing a quality of play multiple degrees higher than that achieved by the best poker players in the world.

59.     Despite these metrics, Mr. Postle has – since commencing his run on Stones Live Poker – only rarely played cash poker games in other forums, almost never played in any cash poker games at Stones aside from those broadcast on Stones Live Poker, and habitually stopped playing on the Stones Live Poker game as soon as the broadcast ends (even though it is common for players to remain and play "offline" for some time thereafter).

60.     Similarly, Mr. Postle is not known – since commencing his run on Stones Live Poker – to have played on any other streamed poker game, even though at least one other stream (offering higher stakes and, thus, a greater chance for profit) runs regularly in California; nor has Mr. Postle been known to play with great frequency and regularity in any other cash poker games (streamed or unstreamed), in any location, during this time (even though higher stake games – offering, again, a greater chance for profit – regularly run in Las Vegas, Reno, Los Angeles, Atlantic City, Southern Florida, and other locations to which poker professionals regularly travel to maximize their earnings).

61.     Mr. Postle was able to achieve these results by engaging in a pattern and practice of using one or more wire communication mechanisms to defraud his opponents by gaining knowledge of their Hole Cards during the play of poker hands.

COMPLAINT AND DEMAND FOR TRIAL BY JURY - 12

62.     To carry out this pattern and practice, Mr. Postle was aided by one or more confederates – the John Doe 1-10 and Jane Doe 1-10 Defendants herein – who furnished him with this information, for purposes of carrying out a fraud, through one or more concealed communicative mechanisms.

63.     The Plaintiffs have reason to believe the mechanisms through which these myriad acts of wire fraud were carried out by Mr. Postle, John Does 1-10 and Jane Does 1-10 involved Mr. Postle's cellular telephone being grasped by his left hand while concealed under the poker table and/or Mr. Postle's baseball cap being imbedded with a communications device creating an artificial bulge in its lining (that is notably absent in photographs of the same baseball cap on Mr. Postle when he is not playing on Stones Live Poker).

64.     For the avoidance of doubt, the Plaintiffs make their allegation of Mr. Postle systematically, habitually and regularly cheating at Stones Live Poker games based not on a hunch or suspicion correlative to any one specific cheating device but, rather, based on a statistical analysis of his results and analytical review of the manner in which he played.

65.     For the avoidance of doubt, the Plaintiffs allege Mr. Postle to have used one or more wire communication facilities, with the aid of a confederate, based on an understanding that this cheating behavior occurred only at the RFID Table; the RFID Table is equipped to reveal players' concealed cards through wire communications; and it would not be possible for Mr. Postle to have such information relayed to him without the aid of a confederate.

66.     There exists, too, instance-specific evidence of Mr. Postle being aware of other players' precise hidden cards; on one occasion he visited the Commentator after a Stone Live Poker game to discuss his play, and indicated he was aware that a specific hand had only displayed "two of our cards" to the viewing public (whereas four cards should have been

COMPLAINT AND DEMAND FOR TRIAL BY JURY - 13

displayed, based on the type of poker being played), even though he would not have had the

opportunity to view the broadcast – and, thus, become aware of this technical malfunction – prior

to making that comment, unless he had illicitly accessed the information in real time, with the aid

of one or more confederates.

67.     During this hand, in which only two (2) of each player's four (4) Hole Cards were

captured by the RFID Table, Mr. Postle can be seen repeatedly looking at his cellular telephone

under the table and endeavoring to spread all four (4) of his Hole Cards over the RFID Table's

censor, in a deliberate and highly unusual manner; his demeanor throughout the hand is

exceedingly strange, and it is manifest this technical malfunction (which, in turn, denies him the

ability to play the hand with knowledge of his opponents' Hole Cards) is distressing to Mr.

Postle even though the malfunction it is one of which he would have no real time knowledge if

he was not engaged in fraudulent cheating behavior.

68.     While there are a handful of Stones Live Poker sessions in which Mr. Postle did

not make money, and in which he played in a sub-optimal manner, the Plaintiffs have

information and a belief that such sessions correlate to the absence of Mr. Postle's suspected

chief confederate, John Doe 1, and the Plaintiffs further allege Mr. Postle's participation in

Stones Live Poker games was uncharacteristically rare – in contrast to his normal schedule –

when the person the Plaintiffs believe to be John Doe 1 was absent from the Sacramento area.

**General Allegations: Coverup**

69.     On multiple occasions, when Mr. Postle's play of a given poker hand could not be

explained through any point of strategy or style, and was instead heavily suggestive of cheating,

one or more agents of Stones would announce his cards, as displayed on viewers' screens, were

errant, and on at least one occasion the image would then "correct" the cards to suggest he was holding a different hand.

70.     For various technical reasons, it is not possible for the RFID Table to have misread Mr. Postle's cards only when they were dealt to Mr. Postle; if a misread was to occur, it would chronically follow the same precise cards of the deck when dealt to any player in the game, in any hand of poker in that given game.

71.     On every occasion where there was a "misread" of Mr. Postle's hand in such an instance, the "corrected" cards served to make more plausible Mr. Postle's behavior in the given hand; never did such serve to make Mr. Postle's play of the hand less plausible.

72.     These faux corrections were part of a pattern and practice, on the part of Stones through its agent(s), to conceal Mr. Postle's cheating from the public.

73.     Commencing at least as early as March 13, 2019, numerous individuals approached Mr. Kuraitis to indicate the play of Mr. Postle on Stones Live Poker can only be attributed to cheating or, at minimum, is strongly indicative of the presence of cheating.

74.     Mr. Kuraitis repeatedly told multiple persons Mr. Postle was not cheating but, to the contrary, Mr. Postle's play is simply "on a different level" or he is "just on a heater" and his play is not something that can be explained.

75.     Mr. Kuraitis told multiple persons Stones conducted a thorough investigation into the matter and such did not reveal the presence of cheating.

76.     On September 29, 2019, Stones – through its @StonesLivePoker Twitter handle – responded to allegations of cheating on the part of Mr. Postle by writing, *inter alia*, "We conducted a full investigation & found no evidence that any cheating had occurred," going on to

write, in response to public allegations then made by Ms. Brill, "The recent allegations are completely fabricated."

77.     It is not clear how a "full investigation" could have been carried out by Stones prior to September 29, 2019; none of the Plaintiffs herein – all persons who played on Stones Live Poker with Mr. Postle – were ever approached or interviewed in furtherance of such an investigation and, upon information and belief, neither was Mr. Postle.

78.     To the contrary, if an investigation was undertaken (and the Plaintiffs do not know if one was or one was not), the same would necessarily not have been a "full" investigation in any normative sense of the term.

79.     Rather, when suspicions and concerns about Mr. Postle's play began to be raised, Stones – through Mr. Kuraitis and others – sought to quell such by giving false assurances a "full" investigation was undertaken, by playing up Mr. Postle as a deity-like figure through the introduction of certain graphics on the Stones Live Poker broadcast, and by telling players they simply did not understand Mr. Postle's immensely talented play.

80.     By taking these concerted actions, Stones was able to prolong the period of time in which Mr. Postle cheated other poker players out of their money, was able to elongate Mr. Postle's fraudulent conduct, and was able to allow for the further enrichment of Mr. Postle and his confederate(s).

81.     Only after Ms. Brill made public her suspicions, and the poker community at large responded by carrying out a series of *ad hoc* investigations through utilization of footage of old Stones Live Poker broadcasts, did Stones suspend the Stones Live Poker broadcast and announce the launching of an "independent investigation team."

COMPLAINT AND DEMAND FOR TRIAL BY JURY - 16

82.     However, even in announcing an "independent investigation team," Stones continued its pattern and practice of misleading the public, as the individual Stones publicly designated as heading such team – Michael Lipman – is, in fact, an attorney who has previously represented Stones in connection with gaming matters, who has also served as personal counsel to one or more of Stones' principles, and who – as recently as October 6, 2019 – Stones has referred to as its "outside counsel;" in short, while very much a respected and able attorney, Mr. Lipman is most certainly not "independent" of Stones.

**General Allegations: Damages**

83.     During the course of the events alleged herein, Mr. Postle profited more than Two Hundred Fifty Thousand Dollars ($250,000.00) from his play on Stones Live Poker.

84.     Each of the Plaintiffs herein played on Stones Live Poker with Mr. Postle and contributed chips to one or more pots in which he played.

85.     Most of the Plaintiffs herein lost money in one or more Stones Live Poker sessions in which they played with Mr. Postle, and Mr. Postle won such money from most of the Plaintiffs herein.

86.     Mr. Postle would not have won such money if he was not cheating.

87.     Every one of the Plaintiffs herein was deprived of the opportunity to maximize her or his respective profits in an honest poker game, while playing on Stones Live Poker, because of the conduct alleged herein.

88.     Many of the Plaintiffs herein derive part or all of their living from the play of poker, and have had their confidence in the integrity of the game greatly compromised by Mr. Postle's cheating and Stones' allowance of such cheating.

**General Allegations: Live Stream Security**

89.    Operating a livestream – using a device like the RFID Table – does not have to be, and should not be, a security risk.

90.    Numerous poker rooms have operated RFID-based live streams for several years, without any known instances of cheating having occurred by reason of manipulation of such RFID technology.

91.    By way of anecdote only, one casino in Los Angeles was an early pioneer in operating an RFID-based live stream and still utilizes it to broadcast widely-viewed cash poker games, four (4) to five (5) nights per week, through the present; the security and integrity of such casino's streaming operation is not readily subject to meaningful or well-reasoned challenge.

92.    Stones, however, utilized an appreciably more lackadaisical approach to security with its Stones Like Poker stream, allowing the room in which concealed information is reviewed in real time (the "Production Room") to be readily accessibly by numerous people; by not constructing a proper security perimeter around the Production Room; by allowing the use of cellular telephones in the Production Room, during Stones Live Poker streams; and otherwise.

93.    Not only does this case not challenge the permissibility of undertaking a live poker stream but, to the contrary, this case is premised, in large part, upon the understanding that such live poker streams can – and should – be carried out in a secure and intelligent fashion, and that Stones was grossly negligent in not even feigning compliance with prevailing industry norms and standards for such an operation.

**Count I – Violation of the Racketeer Influenced and Corrupt Organizations Act**

**As Codified at Section 1962(c) of Title 18 of the United States Code**

**As Against Mr. Postle, John Does 1-10, and Jane Does 1-10**

94.     The Plaintiffs repeat and reallege each and every foregoing paragraph of this Complaint, as though fully set forth herein.

95.     Mr. Postle, John Does 1-10, and Jane Does 1-10, "devised … [a] scheme or artifice to defraud, or for obtaining money … by means of false or fraudulent pretenses, [and] representations," in furtherance of which they did "transmit[] or causes to be transmitted by means of wire … communication in interstate or foreign commerce, … signals, pictures, or sounds for the purpose of executing such scheme or artifice," in contravention of Section 1343 of Title 18 of the United States Code.

96.     Specifically, Mr. Postle, John Does 1-10, and Jane Does 1-10 used one or more instrumentalities of wire transmissions to relay to Mr. Postle, while playing in the Stones Live Poker games, information concerning the concealed card holdings of other players in the game, with such being transmitted for the express purpose of aiding Mr. Postle in a scheme to make money from such other players by fraudulently cheating in such game; Mr. Postle, John Does 1-10, and Jane Does 1-10, working together, directed the scheme.

97.     Based on a review of video footage of several Stones Like Poker games, this scheme to defraud involved transmitting to Mr. Postle, via his cellular telephone, information concerning the concealed cards of other players, on multiple occasions.

98.     The specific mechanism(s) through which such information was fed to Mr. Postle by John Does 1-10 and Jane Does 1-10 is known only to them as of the filing of this Complaint, and will be learned through discovery herein; the Plaintiffs do, however, have information

sufficient to specifically allege wire communications to have been sent to Mr. Postle's telephone, know such transmissions occurred during Stones Live Poker games, to allege such transmissions were made for purposes of defrauding the Plaintiffs (and others), and to allege such transmissions contained information concerning the concealed cards of the Plaintiffs (and others).

99.     The actions alleged in this Count I all occurred after Mr. Postle, John Does 1-10, and Jane Does 1-10 devised a scheme to defraud individuals – including the Plaintiffs – by having Mr. Postle cheat while playing in Stones Live Poker games.

100.    The fraudulent conduct alleged in this Count I occurred on at least the following dates:

| | |
|---|---|
| i. | July 18, 2018 |
| ii. | July 30, 2018 |
| iii. | August 1, 2018 |
| iv. | August 3, 2018 |
| v. | August 6, 2018 |
| vi. | August 10, 2018 |
| vii. | August 15, 2018 |
| viii. | August 22, 2018 |
| ix. | August 29, 2018 |
| x. | September 5, 2018 |
| xi. | September 15, 2018 |
| xii. | September 24, 2018 |
| xiii. | September 26, 2018 |

xiv.    October 10, 2018

xv.    October 17, 2018

xvi.    October 19, 2018

xvii.    October 20, 2018

xviii.    October 24, 2018

xix.    October 29, 2018

xx.    November 7, 2018

xxi.    November 21, 2018

xxii.    November 26, 2018

xxiii.    November 28, 2018

xxiv.    December 5, 2018

xxv.    December 12, 2018

xxvi.    December 16, 2018

xxvii.    December 17, 2018

xxviii.    January 2, 2019

xxix.    January 7, 2019

xxx.    January 9, 2019

xxxi.    January 12, 2019

xxxii.    January 14, 2019

xxxiii.    January 16, 2019

xxxiv.    January 19, 2019

xxxv.    January 30, 2019

xxxvi.    February 9, 2019

| | | |
|---|---|---|
| xxxvii. | February 16, 2019 | |
| xxxviii. | February 25, 2019 | |
| xxxix. | February 27, 2019 | |
| xl. | March 9, 2019 | |
| xli. | March 13, 2019 | |
| xlii. | March 16, 2019 | |
| xliii. | March 18, 2019 | |
| xliv. | March 23, 2019 | |
| xlv. | March 25, 2019 | |
| xlvi. | April 8, 2019 | |
| xlvii. | April 20, 2019 | |
| xlviii. | April 22, 2019 | |
| xlix. | April 30, 2019 | |
| l. | May 2, 2019 | |
| li. | May 3, 2019 | |
| lii. | May 4, 2019 | |
| liii. | May 8, 2019 | |
| liv. | May 13, 2019 | |
| lv. | May 18, 2019 | |
| lvi. | May 20, 2019 | |
| lvii. | July 20, 2019 | |
| lviii. | July 22, 2019 | |
| lix. | July 31, 2019 | |

COMPLAINT AND DEMAND FOR TRIAL BY JURY - 22

lx.     August 3, 2019

lxi.    August 5, 2019

lxii.   August 7, 2019

lxiii.  August 14, 2019

lxiv.   August 17, 2019

lxv.    August 21, 2019

lxvi.   September 9, 2019

lxvii.  September 18, 2019

lxviii. September 21, 2019

101.    Mr. Postle, John Does 1-10, and Jane Does 1-10 did constitute an "enterprise," as that term is defined in Section 1961(4) of Title 18 of the United States Code, at all times relevant.

102.    While the Plaintiffs do not know how many persons participated in such "enterprise," and will need discovery to learn such information as it is uniquely known to the Defendants as of present, the Plaintiffs do specifically allege Mr. Postle had at least one confederate, that such confederate – John Doe 1 – is the individual who caused to be transmitted to Mr. Postle the information concerning other players' Hole Cards during Stones Live Poker games, and that such confederate also took steps to allay suspicions and concerns regarding Mr. Postle's cheating so as to allow the same conduct to continue in an unabated manner for a protracted period of time in excess of one (1) year.

103.    The actions of Mr. Postle, John Doe 1, and Mr. Postle's other confederate(s) did constitute a "pattern of racketeering activity," as that term is defined in Section 1961(5) of Title 18 of the United States Code, as individual acts of wire fraud occurred on at least sixty eight (68)

separate occasions, correlating to every time Mr. Postle cheated in a Stones Live Poker game throughout the calendar years 2018 and 2019.

104.    The Plaintiffs' property interests have been damaged through the racketeering conduct set forth herein, as each has been deprived of monies – or the opportunity to win monies in an honest poker game – by reason of the racketeering conduct.

105.    Specifically, most Plaintiffs have lost money to Mr. Postle, in cheated hands of poker, that would not have been lost but for Mr. Postle cheating.

106.    Specifically, most Plaintiffs would have derived winnings from hands of poker but for their inability to do so as a result of Mr. Postle cheating.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in favor of each Plaintiff, individually, and against Mr. Postle, John Does 1-10, and Jane Does 1-10, jointly and severally, in an amount equal to three times the damages suffered by each individual Plaintiff, pursuant to the allowances of Section 1964(c) of Title 18 of the United States Code; (ii) award each Plaintiff his or her respective attorneys' fees and suit costs incurred in connection with this action, and reduce the same to judgment in favor of each Plaintiff individually, with each such judgment being jointly and severally against Mr. Postle, John Does 1-10 and Jane Does 1-10, pursuant to the allowances of Section 1964(c) of Title 18 of the United States Code; and (iii) afford such other and further relief as may be just and proper.

## Count II – Fraud

### As Against Mr. Postle, John Does 1-10, and Jane Does 1-10

107.    The Plaintiffs repeat and reallege each and every foregoing paragraph of this Complaint, as though fully set forth herein.

COMPLAINT AND DEMAND FOR TRIAL BY JURY - 24

108.    Mr. Postle and his confederate(s) implicitly represented to all players participating in Stones Live Poker games that Mr. Postle is a fellow honest participant in such games.

109.    This representation was false, as Mr. Postle and his confederate(s) were utilizing various wire communication facilities to permit Mr. Postle to cheat in such games.

110.    Mr. Postle and his confederate(s) had knowledge of the falsity of these representations, as their own overt conduct was required to carry out the fraud alleged herein.

111.    Mr. Postle and his confederate(s) made these implicit representations with the intent to defraud others by inducing their play in Stones Live Poker games where Mr. Postle could then take their money.

112.    The Plaintiffs herein justifiably relied on these fraudulent representations, electing to wager their own hard-earned money in Stones Live Poker games believing such to be honest and fair contests.

113.    The Plaintiffs herein have been damaged both in the form of monies lost to Mr. Postle in such Stones Live Poker games and, too, the loss of opportunity to earn monies through honest games of poker broadcast to the viewing public on a stream.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in favor of each Plaintiff, individually, and against Mr. Postle, John Does 1-10, and Jane Does 1-10, jointly and severally, in an amount equal to the damages suffered by each individual Plaintiff; (ii) enter judgment favor of each Plaintiff, individually, and against Mr. Postle, John Does 1-10, and Jane Does 1-10, jointly and severally, as and for punitive damages, in the sum of Ten Million Dollars and No Cents ($10,000,000.00), divided *pari passu* between and amongst the Plaintiffs in proration to the number of minutes they spent playing on the Stones Like Poker broadcast

1  from July 18, 2018 through the present; and (iii) afford such other and further relief as may be

2  just and proper.

3  ### Count III – Negligent Misrepresentation

4  ### As Against Mr. Postle, Stones, Mr. Kuraitis, John Does 1-10, and Jane Does 1-10

5

6      114.   The Plaintiffs repeat and reallege each and every foregoing paragraph of this

7  Complaint, as though fully set forth herein.

8      115.   The Defendants implicitly and explicitly herein represented the Stones Live Poker

9  games to be honest poker games monitored and effectively regulated by a licensed gaming

10  operator in full compliance with California law.

11      116.   Mr. Postle did so through the conduct alleged *supra* in Count II of this Complaint.

12      117.   Mr. Kuraitis – individually and as an agent of Stones – did so when he allayed

13  suspicions of cheating by telling people Mr. Postle's play of poker was simply on "a different

14  level," and that Mr. Postle is "on a heater," while also telling at least one Plaintiff that Stones

15  undertakes a quarterly security audit of its Stones Live Poker system and assuring multiple

16  Plaintiffs that Stones had investigated Mr. Postle's play and cleared him.

17

18      118.   Stones also made this representation implicitly by conducting Stones Live Poker

19  games in a licensed casino, wherein there exists an implicit representation players are protected

20  from the cheating of other players through utilization of adequate and sufficient security

21  measures and protocols.

22

23      119.   These representations were untrue, as Mr. Postle was cheating in the Stones Live

24  Poker games from at least July 2018 onward.

25

26      120.   Mr. Postle made this implicit representation without a reasonable basis for

27  believing it to be true, inasmuch as he personally knew of his own cheating conduct.

28

121.    Stones and Mr. Kuraitis made these representations without a reasonable basis for believing them to be true, as they continuously concealed allegations of cheating on the part of Mr. Postle, and failed to supervise the Stones Live Poker with adequate and sufficient security.

122.    Stones also knew this representation to be untrue because at least one agent of Stones served as a John Doe or Jane Doe confederate of Mr. Postle in aiding him with carrying out his scheme to defraud other poker players.

123.    These representations were universally made with an intent to induce reliance on the part of the Plaintiffs in the form of having the Plaintiffs continue to play in the Stones Live Poker games.

124.    The Plaintiffs did detrimentally rely on these representations by continuing to play in the Stones Live Poker games.

125.    The Plaintiffs herein have been damaged both in the form of monies lost to Mr. Postle in such Stones Live Poker games and, too, the loss of opportunity to earn monies through honest games of poker broadcast to the viewing public on a stream.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in favor of each Plaintiff, individually, and against Mr. Postle, Stones, Mr. Kuraitis, John Does 1-10, and Jane Does 1-10, jointly and severally, in an amount equal to the damages suffered by each individual Plaintiff; and (ii) afford such other and further relief as may be just and proper.

## Count IV – Negligence Per Se

### As Against Mr. Postle, John Does 1-10, and Jane Does 1-10

126.    The Plaintiffs repeat and reallege each and every foregoing paragraph of this Complaint, as though fully set forth herein.

127.    Mr. Postle and his confederate(s) "devised ... [a] scheme or artifice to defraud, or for obtaining money ... by means of false or fraudulent pretenses, [and] representations," in furtherance of which they did "transmit[] or causes to be transmitted by means of wire ... communication in interstate or foreign commerce, ... signals, pictures, or sounds for the purpose of executing such scheme or artifice," in contravention of Section 1343 of Title 18 of the United States Code.

128.    This violation of controlling law, on the part of Mr. Postle and his confederates, has caused the Plaintiffs to suffer damages in the form of monies lost to Mr. Postle in Stones Live Poker games and, too, the loss of opportunity to earn monies through honest games of poker broadcast to the viewing public on a stream.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in favor of each Plaintiff, individually, and against Mr. Postle, John Does 1-10, and Jane Does 1-10, jointly and severally, in an amount equal to the damages suffered by each individual Plaintiff; and (ii) afford such other and further relief as may be just and proper.

### Count V – Unjust Enrichment

### As Against Mr. Postle

129.    The Plaintiffs repeat and reallege each and every foregoing paragraph of this Complaint, as though fully set forth herein.

130.    Mr. Postle won monies from the Plaintiffs through his cheating on the Stones Live Poker broadcasts.

131.    It is unjust for Mr. Postle to retain such illicit winnings when they should, as a matter of fact and law alike, be returned to the Plaintiffs.

COMPLAINT AND DEMAND FOR TRIAL BY JURY - 28

132.   A failure on the part of Mr. Postle to return these winnings will result in his being unjustly enriched to the detriment of the Plaintiffs.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in favor of each Plaintiff, individually, and against Mr. Postle, in an amount equal to the damages suffered by each individual Plaintiff; and (ii) afford such other and further relief as may be just and proper.

### Count VI – Negligence

### As Against Stones and Mr. Kuraitis

133.   The Plaintiffs repeat and reallege each and every foregoing paragraph of this Complaint, as though fully set forth herein.

134.   As the director of Stones Live Poker, Mr. Kuraitis – individually and as an agent of Stones – had a duty to ensure the game was carried out in a manner reasonably free of cheating, and to take reasonable steps to detect and stop any cheating from occurring.

135.   Mr. Kuraitis breached this duty by not adequately investigating allegations of cheating on the part of Mr. Postle, not following such allegations with an objective examination of Mr. Postle's play (which would have confirmed the presence of cheating), and allowing Mr. Postle to remain in the Stones Live Poker games.

136.   Stones breached this duty by maintaining a control room that did not adhere to prevailing industry standards for security.

137.   These breaches have caused the Plaintiffs to sustain damages, as they each continued to play in poker games in which criminal fraud was being carried out; they each either lost money, or lost the opportunity to maximize profit, in such games; and they have each had their confidence in the fairness of poker games disrupted and disturbed.

138.    The Plaintiffs have each been damaged in an amount equal to their pro rata share of the monies Mr. Postle won, as well as in a sum equal to other losses they sustained by playing in a fraudulent poker game.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court enter judgment in each of their favor, individually, and against Mr. Kuraitis and Stones, jointly and severally, in a sum equal to the damages they have each sustained as a result of the negligence of Stones and Mr. Kuraitis; and for such other and further relief as may be just and proper.

### Count VII – Constructive Fraud

### As Against Stones

139.    The Plaintiffs repeat and reallege each and every foregoing paragraph of this Complaint, as though fully set forth herein.

140.    Stones had a legal duty to monitor the Stones Live Poker game for cheating and to take reasonable steps and measures to prevent the occurrence of cheating therein.

141.    This duty was owed to the Plaintiffs as players in the Stones Live Poker game.

142.    Stones breached this duty by concealing from the Plaintiffs allegations of cheating and fraud on the part of Mr. Postle.

143.    Stones breached this duty by allaying the suspicions of certain Plaintiffs with false assurances of a thorough investigation and quarterly audits being undertaken.

144.    Stones breached this duty by maintaining a control room that did not adhere to prevailing industry standards for security.

145.    The Plaintiffs herein have been damaged both in the form of monies lost to Mr. Postle in such Stones Live Poker games and, too, the loss of opportunity to earn monies through honest games of poker broadcast to the viewing public on a stream.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in favor of each Plaintiff, individually, and against Stones, in an amount equal to the damages suffered by each individual Plaintiff; (ii) enter judgment favor of each Plaintiff, individually, and against Stones, as and for punitive damages, in the sum of Ten Million Dollars and No Cents ($10,000,000.00), divided *pari passu* between and amongst the Plaintiffs in proration to the number of minutes they spent playing on the Stones Like Poker broadcast from July 18, 2018 through the present; and (iii) afford such other and further relief as may be just and proper.

### Count VIII – Fraud

### As Against Stones and Mr. Kuraitis

146.    The Plaintiffs repeat and reallege each and every foregoing paragraph of this Complaint, as though fully set forth herein.

147.    Mr. Kuraitis, in his capacity as an employee and agent of Stones, expressly told Ms. Brill, Ms. Mills, and Mr. Goone (the "Stones Fraud Victims") there was no cheating in the Stones Live Poker broadcast.

148.    Mr. Kuraitis further informed the Stoned Fraud Victims a thorough investigation of such cheating allegations had occurred or would be occurring.

149.    Mr. Kuraitis knew, or should have known, these representations to be false; had he reviewed the cumulative footage of Mr. Postle's play, it would have revealed cheating to be rampant, and it is not possible for any putative investigation carried out to have been thorough and such would have revealed the cheating underlying this Complaint.

150.    The Stones Fraud Victims relied on these counterfactual representations in continuing to play on Stones Live Poker; had they known the game to be fraudulent, they would have declined to further participate in the game.

COMPLAINT AND DEMAND FOR TRIAL BY JURY - 31

151.    The Stones Fraud Victims have been damaged by these representations in an amount equal to their pro rata share of the monies Mr. Postle won, as well as in a sum equal to other losses they sustained by playing in a fraudulent poker game.

152.    The fraudulent representation made to the Stones Fraud Victims, by Mr. Kuraitis, while acting for himself and on behalf of Stones, are particularly outrageous, as they served to allow the continuation of the largest known fraud in the modern history of live poker.

WHEREFORE, the Stones Fraud Victims respectfully pray this Honorable Court (i) enter judgment in their favor, individually, and against Mr. Kuraitis and Stones, jointly and severally, in an amount equal to their pro rata share of the monies Mr. Postle won, as well as in a sum equal to other losses they sustained by playing in a fraudulent poker game; (ii) enter judgment in their favor, individually, and against Mr. Kuraitis and Stones, jointly and severally, as and for punitive damages, in the sum of Ten Million Dollars and No Cents ($10,000,000.00), divided *pari passu* between and amongst the Stones Fraud Victims in proration to the number of minutes they spent playing on the Stones Like Poker broadcast from January 1, 2019 through the present; and (iii) afford such other and further relief as may be just and proper.

### Count IX – Libel

### As Against Stones

153.    The Plaintiffs repeat and reallege each and every foregoing paragraph of this Complaint, as though fully set forth herein.

154.    After Ms. Brill made public her suspicions of Mr. Postle cheating on the Stones Live Poker broadcast, Stones responded by asserting, on a publicly-available social media account, *inter alia*, "The recent allegations are completely fabricated."

COMPLAINT AND DEMAND FOR TRIAL BY JURY - 32

155.    This statement was and is demonstrably counterfactual; the precise allegations made by Ms. Brill – that there is anecdotal and circumstantial evidence to believe someone has been cheating on the Stones Live Poker broadcast – were truthful in nature, objective in nature, and genuine in nature.

156.    As a direct and proximate result of Stones accusing Ms. Brill of making "completely fabricated" allegations, Ms. Brill suffered bullying, harassment, and emotionally-taxing non-physical attacks on social media and elsewhere.

157.    While Ms. Brill was rapidly acquitted of this libelous statement by third party members of the poker community who made public their ad hoc investigations, she nonetheless suffered the emotional duress of having her integrity and reputation sullied for a period of days before such acquittal could be brought about by the mitigating efforts of third party individuals.

158.    Ms. Brill brings this Count X solely to seek nominal damages, and in an effort to highlight Stones' efforts to coverup the criminal activity alleged *passim* as being so pervasive as to extend to libeling one of the individuals who played on the Stones Live Poker game; she does not seek any damages correlative to the mental toll such libelous conduct took on her, nor does she seek any lost compensation nor any reputational damages, as the mitigation of Stones' conduct, by the poker community at large, has served to restore Ms. Brill's good name.

WHEREFORE, Ms. Brill respectfully prays this Honorable Court enter judgment against Stones, and in her favor, in the sum of One Thousand Dollars and No Cents ($1,000.00), and for such other and further relief as may be just and proper.

**[JURY DEMAND AND SIGNATURES ON FOLLOWING PAGE]**

COMPLAINT AND DEMAND FOR TRIAL BY JURY - 33

**Jury Demand**

Pursuant to, and in accordance with, the allowances of Federal Rule of Civil Procedure 38, the Plaintiffs pray a trial by jury on all matters so triable.

Dated this 8th day of October, 2019.

Respectfully Submitted,

Maurice B. VerStandig, Esq.
*Pro Hac Vice* Petition Forthcoming
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
Telephone: (301) 444-4600
Facsimile: (301) 576-6885
mac@mbvesq.com
*Counsel for the Plaintiffs*

Kelly Minkin, Esq.
*Pro Hac Vice Forthcoming*
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
Telephone: 301-444-4600
Facsimile: 301-576-6885
E-mail: kelly@mbvesq.com
*Counsel for the Plaintiffs*

/s/ Julian K. Bach
Julian K. Bach, Esq.
California Bar No. 162421

William H. Pillsbury, Esq.
*Pro Hac Vice Forthcoming*
Law Offices of William H. Pillsbury PLLC
3959 Welsh Road #333
Willow Grove, PA 19090
Telephone: 267-518-3445
wpillsbury@whplawoffices.com
*Counsel for the Plaintiffs*

Law Offices of Julian Bach
7911 Warner Avenue
Huntington Beach, California 92647
Telephone: 714-848-5085
Facsimile: 714-848-5086
E-mail: julian@jbachlaw.com
*Designated Counsel Pursuant to Local Rule 180(b)(2)(ii)*

COMPLAINT AND DEMAND FOR TRIAL BY JURY - 34