1

Maurice B. VerStandig, Esq.
Admitted *Pro Hac Vice*

2

The VerStandig Law Firm, LLC

3

1452 W. Horizon Ridge Pkwy, #665
Henderson, Nevada 89012

4

Telephone: 301-444-4600
Facsimile: 301-576-6885

5

E-mail: mac@mbvesq.com
*Counsel for the Plaintiffs*

6

7                    UNITED STATES DISTRICT COURT

8                    EASTERN DISTRICT OF CALIFORNIA

9

VERONICA BRILL; KASEY LYN MILLS;
MARC GOONE; NAVROOP SHERGILL;

10

JASON SCOTT; AZAAN NAGRA; ELI
JAMES; PHUONG PHAN; JEFFREY

11

SLUZINSKI; HARLAN KARNOFSKY;
NATHAN PELKEY; MATTHEW ALLEN

12

HOLTZCLAW; JON TUROVITZ; ROBERT
YOUNG; BLAKE ALEXANDER KRAFT;

13

JAMAN YONN BURTON; MICHAEL
ROJAS; HAWNLAY SWEN; THOMAS

14

MORRIS III; PAUL LOPEZ; ROLANDO
CAO; BENJAMIN JACKSON; HUNG SAM;

15

COREY CASPERS; ADAM DUONG;
DUSTIN MCCARTHY; CHOU VINCE

16

XIONG; BRIAN OLSON; CAMERON
SMITH; JORDAN DIAMOND; ARONN

17

SOLIS; ALISHA DANIELS-DUCKWORTH;
CHRISTIAN SOTO VASQUEZ; ANDREW

18

HERNANDEZ; DARRELL STEED; ARISH S.
NAT; KYLE KITAGAWA; BRIAN MICHAEL

19

RAASCH; ZEEV MALKIN; DAVID
CRITTENTON; PATRICK LAFFEY; PARAS

20

SINGH; FIRAS BOURI; IDRIS M. YONISI;
JOSHUA WHITESELL; DAVID DUARTE;

21

HARUN UNAI BEGIC; BRAD KRAFT;
TAYLOR CARROLL; ELIAS ABOUFARES;

22

TYLER DENSEN; ANDREW LOK; JAKE
ROSENSTIEL; ANTHONY AJLOUNY;

23

HECTOR MARTIN; DALE MENGHE;
SCOTT SCHLEIN; AUGUSTE SHASTRY;

Case No. 2:19-cv-02027-WBS-AC

The Honorable William B. Shubb

FIRST AMENDED COMPLAINT AND
DEMAND FOR TRIAL BY JURY

CAUSES OF ACTION:
1.  VIOLATION OF THE RACKETEER
INFLUENCED CORRUPT ORGANIZATION
ACT AS CODIFIED AT SECTION 1962(C)
OF TITLE 18 OF THE UNITED STATES
CODE
2.  FRAUD
3.  NEGLIGENT MISREPRESENTATION
4.  NEGLIGENCE PER SE
5.  UNJUST ENRICHMENT
6.  NEGLIGENCE
7.  CONSTRUCTIVE FRAUD
8.  FRAUD
9.  LIBEL
10. CONSUMER LEGAL REMEDIES ACT
11. NEGLIGENCE PER SE



FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 1

NICHOLAS COLVIN; JASON MARKWITH;
BRIAN WATSON; SHANE GONZALES;
KATHERINE STAHL; MIKE NELSON;
BRANDON STEADMAN; BRYANT
MILLER; HONG MOON; MATTHEW
GOUGE; NICHOLAUS WOODERSON;
CARLOS WELCH; ARIEL REID; DAN
MAYER; ANTHONY GIGLINI; RYAN
JACONETTI; ARIEL CRIS MANIPULA;
TRENTON SIDENER; JAMES JOHN
O'CONNOR; PATRICK VANG; MARCUS
DAVIS; ADAM COHEN; DERICK COLE;
AARON MCCORMACK; BRENNEN
ALEXANDER COOK; MICHAEL
PHONESAVANH RASPHONE; BENJAMIN
TENG; SCOTT SORENSON; ANTHONY
HUGENBERG; BILLY JOE MESSIMER

              Plaintiffs,

vs.

MICHAEL L. POSTLE; KING'S CASINO,
LLC D/B/A STONES GAMBLING HALL;
JUSTIN F. KURAITIS; JOHN DOES 1-10;
JANE DOES 1-10

              Defendants.

        Come now Veronica Brill ("Ms. Brill"), Kasey Lyn Mills ("Ms. Mills"); Marc Goone

("Mr. Goone"), Navroop Shergill ("Mr. Shergill"); Jason Scott ("Mr. Scott"); Azaan Nagra ("Mr.

Nagra"); Eli James ("Mr. James"); Phuong Phan ("Mr. Phan"); Jeffrey Sluzinski ("Mr.

Sluzinski"), Harlan Karnofsky ("Mr. Karnofsky"); Nathan Pelkey ("Mr. Pelkey"); Matthew

Allen Holtzclaw ("Mr. Holtzclaw"); Jon Turovitz ("Mr. Turovitz"); Robert Young ("Mr.

Young"); Blake Alexander Kraft ("Mr. Kraft"); Jaman Yonn Burton ("Mr. Burton"); Michael

Rojas ("Mr. Rojas"); Hawnlay Swen ("Mr. Swen"); Thomas Morris III ("Mr. Morris"); Paul

Lopez ("Mr. Lopez"); Rolando Cao ("Mr. Cao"); Benjamin Jackson ("Mr. Jackson"); Hung Sam



FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 2

("Mr. Sam"); Corey Caspers ("Mr. Caspers"); Adam Duong ("Mr. Duong"); Dustin McCarthy ("Mr. McCarthy"); Chou Vince Xiong ("Mr. Xiong"); Brian Olson ("Mr. Olson"); Cameron Smith ("Mr. Smith"); Jordan Diamond ("Mr. Diamond"); Aronn Solis ("Mr. Solis"); Alisha Daniels-Duckworth ("Ms. Daniels-Duckworth"); Christian Soto Vasquez ("Mr. Vasquez"); Andrew Hernandez ("Mr. Hernandez"); Darrell Steed ("Mr. Steed"); Arish S. Nat ("Mr. Nat"); Kyle Kitagawa ("Mr. Kitagawa"); Brian Michael Raasch ("Mr. Raasch"); Zeev Malkin ("Mr. Malkin"); David Crittenton ("Mr. Crittenton"); Patrick Laffey ("Mr. Laffey"); Paras Singh ("Mr. Singh"); Firas Bouri ("Mr. Bouri"); Idris M. Yonisi ("Mr. Yonisi"); Joshua Whitesell ("Mr. Whitesell"); David Duarte ("Mr. Duarte"); Harun Unai Begic ("Mr. Begic"); Brad Kraft ("Mr. Kraft"); Taylor Carroll ("Mr. Carroll"); Elias AbouFares ("Mr. AbouFares"); Tyler Denson ("Mr. Denson"); Andrew Lok ("Mr. Lok"); Jake Rosenstiel ("Mr. Rosenstiel"); Anthony Ajlouny ("Mr. Ajlouny"); Hector Martin ("Mr. Martin"); Dale Menghe ("Mr. Menghe"); Scott Schlein ("Mr. Schlein"); Auguste Shastry ("Mr. Shastry"); Nicholas Colvin ("Mr. Colvin"); Jason Markwith ("Mr. Markwith"); Brian Watson ("Mr. Watson"); Shane Gonzales ("Mr. Gonzalez"); Katherine Stahl ("Ms. Stahl"); Mike Nelson ("Mr. Nelson"); Brandon Steadman ("Mr. Steadman"); Bryant Miller ("Mr. Miller"); Hong Moon ("Mr. Moon"); Matthew Gouge ("Mr. Gouge"); Nicholaus Wooderson ("Mr. Wooderson"); Carlos Welch ("Mr. Welch"); Ariel Reid ("Mr. Reid"); Dan Mayer ("Mr. Mayer"); Anthony Giglini ("Mr. Giglini"); Ryan Jaconetti ("Mr. Jaconetti"); Ariel Cris Manipula ("Mr. Manipula"); Trenton Sidener ("Mr. Sidener"); James John O'Connor ("Mr. O'Connor"); Patrick Vang ("Mr. Vang"); Marcus Davis ("Mr. Davis"); Adam Cohen ("Mr. Cohen"); Derick Cole ("Mr. Cole"); Aaron McCormick ("Mr. McCormick"); Brennen Alexander Cook ("Mr. Cook"); Michael Phonesavnh Rasphone ("Mr. Rasphone"); Benjamin Teng ("Mr. Teng"); Scott Sorenson ("Mr. Sorenson"); Anthony



Hugenberg ("Mr. Hugenberg"); and Billy Joe Messimer ("Mr. Messimer") (collectively, the "Plaintiffs," with each sometimes being known as a "Plaintiff"), by and through counsel, The VerStandig Law Firm, LLC, pursuant to Federal Rule of Civil Procedure 15(a)(1)(B) and Local Rule 220, and as and for their first amended complaint (the "Complaint") against Michael L. Postle ("Mr. Postle"), King's Casino, LLC d/b/a Stones Gambling Hall ("Stones"), Justin F. Kuraitis ("Mr. Kuraitis"), John Does 1-10 and Jane Does 1-10 (Mr. Postle, Stones, Mr. Kuraitis, John Does 1-10, and Jane Does 1-10 being collectively known as the "Defendants," and each sometimes being known as a "Defendant") state as follows:

<b>Introduction</b>

1.      This case concerns Mr. Postle's systematic use of one or more electronic devices, for purposes of cheating, while playing in broadcast games of poker, to steal hundreds of thousands of dollars from fellow players, together with Stones' collection of administrative fees, to operate those broadcast games of poker as putatively secure and fair contests, despite being on notice of Mr. Postle's cheating.

2.      All poker games at issue herein occurred at Stones' eponymous facility in Citrus Heights, California; as concerns and suspicions about Mr. Postle's cheating were repeatedly brought to Stones' management, the casino operator habitually sought to downplay such concerns while simultaneously promoting Mr. Postle as an idiosyncratically gifted individual imbued with poker skills so immense as to be incomprehensible to the average person.

3.      By downplaying concerns and, in so doing, allowing Mr. Postle to continue cheating, Stones was able to enrich itself by continuing to collect a so-called "rake" from the Plaintiffs herein, even though they would not have participated in games with Mr. Postle – and



thusly not permitted Stones to enrich itself off of such games – had they known of Mr. Postle's cheating.

4.      Rather than investigate Mr. Postle's cheating or ban him from playing in poker games, Stones continued to promote Mr. Postle as an in-house celebrity of sorts, going so far as to allow him to begin hosting his own poker games and, upon information and belief, compensating him as an employee of Stones for his work hosting and promoting those games (in which many of the Plaintiffs herein continued to be systematically victimized).

5.      When Ms. Brill made public her concerns of cheating, in late September 2019, Stones initially responded by indicating her observations to be "completely fabricated;" only after the *ad hoc* poker community proceeded to investigate such allegations in myriad public forums, and confirmed Mr. Postle to be engaged in demonstrative cheating, did Stones announce a new investigation to be underway by an "independent" third party who, in actuality, is Stones' own legal counsel.

6.      Despite a public promise to "share outcomes [of its investigation] with transparency," Stones has never made public any findings of its putative investigation and, rather, now insists the Plaintiffs are sore losers who merely believe "their lack of success means they were cheated."

7.      As extrapolated upon *infra*, this case represents the single largest known cheating scandal in the history of broadcast poker, emanates from a series of events that have rocked the poker community, is brought with hopes the discovery process will reveal why Stones appears to have perpetually covered up for Mr. Postle (in the past and through this litigation), and is filed with the aim of bringing redress to the numerous individuals victimized by Mr. Postle, his confederate(s), and Stones itself.



**Parties**

8.      Ms. Brill is a natural person who is a citizen of Canada and domiciliary of the State of California, in which she legally resides.

9.      Ms. Mills is a natural person who is a citizen of the State of Texas by virtue of her ongoing domicile therein.

10.     Mr. Goone is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

11.     Mr. Shergill is a natural person who is a citizen of Canada.

12.     Mr. Scott is a natural person who is a citizen of the State of New Hampshire by virtue of his ongoing domicile therein.

13.     Mr. Nagra is a natural person who is a citizen of the State of Nevada by virtue of his ongoing domicile therein.

14.     Mr. James is a natural person who is a citizen of the State of Nevada by virtue of his ongoing domicile therein.

15.     Mr. Phan is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

16.     Mr. Sluzinski is a natural person who is a citizen of the State of Nevada by virtue of his ongoing domicile therein.

17.     Mr. Karnofsky is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

18.     Mr. Pelkey is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.



19.     Mr. Holtzclaw is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

20.     Mr. Turovitz is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

21.     Mr. Young is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

22.     Mr. Kraft is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

23.     Mr. Burton is a natural person who is a citizen of the State of Missouri by virtue of his ongoing domicile therein.

24.     Mr. Rojas is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

25.     Mr. Swen is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

26.     Mr. Morris is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

27.     Mr. Lopez is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

28.     Mr. Cao is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

29.     Mr. Jackson is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.



FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 7

30.     Mr. Sam is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

31.     Mr. Caspers is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

32.     Mr. Duong is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

33.     Mr. McCarthy is a natural person who is a citizen of the State of Colorado by virtue of his ongoing domicile therein.

34.     Mr. Xiong is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

35.     Mr. Olson is a natural person who is a citizen of the State of Nevada by virtue of his ongoing domicile therein.

36.     Mr. Smith is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

37.     Mr. Diamond is a natural person who is a citizen of the State of New Jersey by virtue of his ongoing domicile therein.

38.     Mr. Solis is a natural person who is a citizen of the State of Arizona by virtue of his ongoing domicile therein.

39.     Ms. Daniels-Duckworth is a natural person who is a citizen of the State of California by virtue of her ongoing domicile therein.

40.     Mr. Vasquez is a natural person who is a citizen of the State of New Jersey by virtue of his ongoing domicile therein.



FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 8

41.     Mr. Hernandez is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

42.     Mr. Steed is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

43.     Mr. Nat is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

44.     Mr. Kitagawa is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

45.     Mr. Raasch is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

46.     Mr. Malkin is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

47.     Mr. Crittenton is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

48.     Mr. Laffey is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

49.     Mr. Singh is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

50.     Mr. Bouri is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

51.     Mr. Yonisi is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.



FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 9

52.      Mr. Whitesell is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

53.      Mr. Duarte is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

54.      Mr. Begic is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

55.      Mr. Kraft is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

56.      Mr. Carroll is a natural person who is a citizen of the State of Arizona by virtue of his ongoing domicile therein.

57.      Mr. AbouFares is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

58.      Mr. Denson is a natural person who is a citizen of the State of Florida by virtue of his ongoing domicile therein.

59.      Mr. Lok is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

60.      Mr. Rosenstiel is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

61.      Mr. Ajlouny is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

62.      Mr. Martin is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.



FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 10

63.     Mr. Menghe is a natural person who is a citizen of the State of Tennessee by virtue of his ongoing domicile therein.

64.     Mr. Schlein is a natural person who is a citizen of the State of Maryland by virtue of his ongoing domicile therein.

65.     Mr. Shastry is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

66.     Mr. Colvin is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

67.     Mr. Markwith is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

68.     Mr. Watson is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

69.     Mr. Gonzalez is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

70.     Ms. Stahl is a natural person who is a citizen of the State of Nevada by virtue of his ongoing domicile therein.

71.     Mr. Nelson is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

72.     Mr. Steadman is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

73.     Mr. Miller is a natural person who is a citizen of the State of Ohio by virtue of his ongoing domicile therein.



74.     Mr. Moon is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

75.     Mr. Gouge is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

76.     Mr. Wooderson is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

77.     Mr. Welch is a natural person who is a citizen of the State of Nevada by virtue of his ongoing domicile therein.

78.     Mr. Reid is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

79.     Mr. Mayer is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

80.     Mr. Giglini is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

81.     Mr. Jaconetti is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

82.     Mr. Manipula is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

83.     Mr. Sidener is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

84.     Mr. O'Connor is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

85.     Mr. Vang is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

86.     Mr. Davis is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

87.     Mr. Cohen is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

88.     Mr. Cole is a natural person who is a citizen of the State of Nevada by virtue of his ongoing domicile therein.

89.     Mr. McCormack is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

90.     Mr. Cook is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

91.     Mr. Rasphone is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

92.     Mr. Teng is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

93.     Mr. Sorenson is a natural person who is a citizen of the State of Minnesota by virtue of his ongoing domicile therein.

94.     Mr. Hugenberg is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.

95.     Mr. Messimer is a natural person who is a citizen of the State of California by virtue of his ongoing domicile therein.



FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 13

96.     Mr. Postle is a natural person who, upon information and belief, is a citizen of the State of California by virtue of his ongoing domicile therein.

97.     Stones is a limited liability company formed pursuant to the laws of the State of Delaware, with a principle place of business in the State of California; the membership of Stones is not known to the Plaintiffs as of the filing of this Complaint but it is anticipated such will be learned in discovery to the extent relevant to this case.

98.     Mr. Kuraitis is a natural person who, upon information and belief, is a citizen of the State of California by virtue of his ongoing domicile therein.

99.     John Does 1-10 and Jane Does 1-10 are persons, natural and/or legal, who (i) conspired with Mr. Postle to cheat at the game of poker through one or more electronic instrumentalities; (ii) aided Mr. Postle in cheating at the game of poker; (iii) worked to conceal Mr. Postle's cheating from discovery by third parties; (iv) were charged with monitoring Stones' eponymous card room for cheating activity and failed to do so; (v) suppressed allegations of Mr. Postle's cheating, leading to the continuation of his tortious conduct; (vi) installed or implemented electronic devices to be utilized by Mr. Postle while cheating at games of poker; (vii) altered broadcast graphics so as to make Mr. Postle's cheating behavior less evident to viewers and the public at large; and/or (viii) aided Mr. Postle in structuring monetary transactions so as to avoid tax reporting requirements. The Plaintiffs have a good faith basis upon which to allege the identity of the person who is John Doe 1, being an individual who directly aided Mr. Postle in cheating by aiding in the concealment of such behavior with knowledge and scienter, and have directed a litigation hold letter to such person. The Plaintiffs, however, are cognizantly refraining from making such allegation against this particular Defendant herein until greater information can be gleaned through the discovery process, in recognition of the

FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 14

sensitivity of making such an allegation. If necessary to conform with the pleading standards of this Honorable Court, however, the Plaintiffs are prepared to amend this Complaint and identify John Doe 1 by his legal name, without the aid of discovery, and do further note that their pre-filing investigation of the facts of this case furnishes them with a sufficient basis to do so; their election to not do so at this time is solely derivative of a desire to be more cautious than required, given the gravity of this matter.

### Jurisdiction and Venue

100.    This Honorable Court enjoys jurisdiction over the matter *sub judice* pursuant to the allowances of Section 1331 of Title 28 of the United States Code, as this case involves a claim for relief arising under the Racketeer Influenced Corrupt Organization Act codified at Section 1961, *et seq.* of Title 18 of the United States Code.

101.    This Honorable Court enjoys supplemental jurisdiction over the state and common law claims set forth herein, pursuant to the allowances of Section 1367(a) of Title 28 of the United States Code, as the first cause of action enumerated herein furnishes this Honorable Court with original jurisdiction as alleged *supra*.

102.    Inasmuch as the damages sought herein exceed Five Million Dollars and No Cents ($5,000,000.00), should there be an infirmity in the federal question raised herein, the Plaintiffs are prepared to amend this Complaint to assert their claims on behalf of themselves and all others similarly situated, and thus invoke this Honorable Court's jurisdiction pursuant to the allowances of Section 1332(d)(2) of Title 28 of the United States Code.

103.    Venue is properly laid in this Honorable Court pursuant to the allowances of Section 1391(b)(2) of Title 28 of the United States Code, as the events complained of herein

occurred within Citrus Heights, California, being within a county enumerated in Section 84(b) of Title 28 of the United States Code.

**General Allegations: Stones Live Poker**

104.     In or about July 2014, Stones opened a casino in Citrus Heights, California (the "Casino"), in which the majority of gaming space is dedicated to a poker room.

105.     As a means of promoting the Casino, attracting more lucrative poker games to the Casino, giving the Casino the aura and ambiance of a "destination," and profiting off the fees charged for operating poker games (the "rake"), Stones installed a single poker table imbedded with radio-frequency identification ("RFID") capabilities, procured playing cards containing RFID censors, and installed various motion picture cameras around the subject poker table (the "RFID Table").

106.     While games of poker are traditionally played in a manner that at least some of each respective player's cards are concealed from everyone except that individual player (the "Hole Cards"), the RFID Table introduced the ability of Stones to transmit – in real time – the identity of each player's Hole Cards to a control room, where such information can be utilized to produce a broadcast of the subject poker game to the public at large.

107.     The phenomenon of broadcasting poker games where the public is able to see players' Hole Cards is neither new nor novel; this has been an emerging trend in the poker industry for much of the past few decades, and one that has allowed television and internet content producers to create more dramatic, appealing programs, by satisfying the desire of viewers to assume an omniscient posture while consuming poker programming.

108.     To avoid the precise variety of cheating evidenced in this case, most purveyors of RFID technology in live poker games feed the information – through one or more encrypted

VS
VerStandig
LAW FIRM

channels – to a separate control room, away from the physical area in which the poker game is being played, and then have the control room produce the broadcast on a delay of typically fifteen (15) to thirty (30) minutes.

109.    Other operators of RFID-enabled poker games – such as the World Series of Poker and the Bicycle Casino in Bell Gardens, California – take extensive steps to ensure the security of players' Hole Cards, so as to protect the integrity of the poker games being broadcast, to entice reputable poker players to participate in such games, and to avoid enabling the sort of rampant criminality alleged in this Complaint.

110.    Stones uses its RFID Table to broadcast "live" poker games (typically on a delay, as discussed *supra*) several nights a week, airing such games on various internet platforms and publicizing such games as "Stones Live Poker."

111.    When Stones utilizes its RFID Table to broadcast poker games, it has one or more persons offer live commentary on the subject game from a booth within the Stones poker room (the "Commentator," defined in the singular even though it is often embodied in the plural).

112.    The Commentator does *not* view RFID information and players' Hole Cards in real time but, rather, watches the produced stream on the same taped delay as the public, and commentates by watching the already-produced visual stream.

113.    Stones Live Poker operated from at least January 2016 until the week prior to the bringing of this suit, when the operation was suspended in light of the scandal giving rise to this case.

114.    At all times relevant, Stones Live Poker has been controlled, *en toto*, by Stones and its agents.

FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 17



115.    From at least 2018 through the present, Mr. Kuraitis – an employee of Stones – has been the director of Stones Live Poker and has been responsible for its production and operation including, *inter alia*, its security.

**General Allegations: Cheating**

116.    Mr. Postle has been a regular and habitual participant in Stones Live Poker games during a period of time commencing in or before January 2018.

117.    While playing in Stones Live Poker games, Mr. Postle has won more money than any other participant, in total, and has oftentimes been the winningest player on the show on any given night in which he is a participant.

118.    Mr. Postle's winnings on the Stones Live Poker broadcast, and his correlative play of poker, have been so exceptionally outstanding as to lead the Commentator to note his seemingly mystical abilities on numerous occasions, and to lead Stones Like Poker to produce various graphics portraying Mr. Postle as a deity-like individual imbued with omniscient powers (with one such graphic conflating an image of Mr. Postle and an image of Jesus Christ).

119.    These winnings and this aura were brought about by Mr. Postle's peculiar ability to make an optimal decision in almost every situation with which he was confronted while playing on Stones Live Poker from July 2018 onward.

120.    This optimal decision making was so precise as to allow Mr. Postle to record net winnings in more than ninety four percent (94%) of the Stones Live Poker games in which he played from July 18, 2018 onward, even though such games are of fixed duration and elevated variance (relative to "normal" poker games); such a winning percentage, under these confined circumstances in a streamed environment, is not known to have ever been achieved by any other poker player – professional or amateur – over such a significant period of time.

121.     This optimal decision making was also so precise as to allow Mr. Postle to record an average profit of more than sixty (60) "big blinds per hour" (a metric used by professional poker player to track winnings, adjusting for the different stakes of various games); by contrast, it is generally noted in poker circles five (5) big blinds per hour is a goal for which one should aspire, ten (10) big blinds per hour is exceptional, and anything more than twenty five (25) big blinds per hour is stratospherically phenomenal over any appreciable period of time due to the high presence of chance in games of poker and the inherent skill of other players.

122.     A detailed review of Mr. Postle's play reveals not only statistics unfathomable in the world of professional poker but, too, situation-specific decision making in which almost every so-called "guess" to be made by Mr. Postle is done so in a manner that optimally benefits his monetary interest.

123.     Analytical observation reveals Mr. Postle's exponential winnings cannot be explained through finely-honed abilities to "read" opponents, as myriad optimal plays made by Mr. Postle required not merely an analysis of his opponent's self-perceived strength or weakness in a poker hand but, rather, the precise composition of such hand; while such may be anecdotally attributed to guess work in a vacuum, Mr. Postle was continuously correct in making such assessments over a period of time in excess of a full year, being analogous to correctly predicting the outcome of a coin toss several hundred times in a row.

124.     In short, Mr. Postle's poker winnings – considered in the prism of both metrics and hand-for-hand decision-making – on Stones Live Poker have been not merely outliers but, in fact, exponential outliers, representing a quality of play multiple degrees higher than that achieved by the best poker players in the world.



125.    Despite these metrics, Mr. Postle has – since commencing his run on Stones Live Poker – only rarely played cash poker games in other forums, almost never played in any cash poker games at Stones aside from those broadcast on Stones Live Poker, and habitually stopped playing on the Stones Live Poker game as soon as the broadcast ends (even though it is common for players to remain and play "offline" for some time thereafter).

126.    Similarly, Mr. Postle is not known – since commencing his run on Stones Live Poker – to have played on any other streamed poker game, even though at least one other stream (offering higher stakes and, thus, a greater chance for profit) runs regularly in California; nor has Mr. Postle been known to play with great frequency and regularity in any other cash poker games (streamed or unstreamed), in any location, during this time (even though higher stake games – offering, again, a greater chance for profit – regularly run in Las Vegas, Reno, Los Angeles, Atlantic City, Southern Florida, and other locations to which poker professionals regularly travel to maximize their earnings).

127.    Mr. Postle was able to achieve these results by engaging in a pattern and practice of using one or more wire communication mechanisms to defraud his opponents by gaining knowledge of their Hole Cards during the play of poker hands.

128.    To carry out this pattern and practice, Mr. Postle was aided by one or more confederates – the John Doe 1-10 and Jane Doe 1-10 Defendants herein – who furnished him with this information, for purposes of carrying out a fraud, through one or more concealed communicative mechanisms.

129.    Specifically, Mr. Postle used a cellular telephone, lodged between his legs so as to have its screen beyond the view of the Plaintiffs herein, to access the identity of the Hole Cards of other players, in real time, while playing in Stones Live Poker games.



130.    While playing in Stones Live Poker games, Mr. Postle would stare – often repeatedly – between his legs, at his cellular telephone, so as to study the Hole Cards of the Plaintiffs herein, and would then use the superior knowledge gleaned from such study (the ultimate form of poker cheating) to defraud the Plaintiffs in a systematic and highly-effective manner.

131.    As Mr. Postle has declined to share the specific software he used to defraud the Plaintiffs and the identities of his confederate(s), and Stones has refused to make its investigation public, despite having sole access to the pertinent software and security records, this case implicates the doctrine set forth in *Estate of Migliaccio v. Midland Nat'l. Life Ins. Co*., 436 F. Supp. 2d 1095, 1106 (C.D. Cal. 2006), where "the facts supporting the allegation of fraud are exclusively within the defendants' possession."

132.    Specifically, the Plaintiffs know who cheated (Mr. Postle), what he did (use his cellular telephone to access the identity of the Plaintiffs' Hole Cards), when he cheated (on the dates set forth *infra*), where he cheated (at Stones' eponymous facility in Citrus Heights, California), and how he cheated (by using his phone to discover the Hole Cards of the Plaintiffs); they do not, however, know the precise software he used, nor the identities of all his confederates, as such information is exclusively within the possession of the various Defendants herein.

133.    For the avoidance of doubt, the Plaintiffs make their allegation of Mr. Postle systematically, habitually and regularly cheating at Stones Live Poker games based not on a hunch or suspicion but, rather, based on a statistical analysis of his results, analytical review of the manner in which he played, and extensive footage of his placing his cellular telephone

FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 21



between his legs and thereafter gazing at it when needing to make certain game-optimal decisions.

134.     For the avoidance of doubt, the Plaintiffs allege Mr. Postle to have used one or more wire communication facilities, with the aid of a confederate, based on an understanding that this cheating behavior occurred only at the RFID Table; the RFID Table is equipped to reveal players' concealed cards through wire communications; and it would not be possible for Mr. Postle to have such information relayed to him without the aid of a confederate.

135.     There exists, too, instance-specific evidence of Mr. Postle being aware of other players' precise hidden cards; on May 6, 2019, he visited the Commentator immediately after a Stone Live Poker game to discuss his play, and indicated he was aware that a specific hand's broadcast had only displayed "two of our cards" to the viewing public (whereas four cards should have been displayed, based on the type of poker being played), even though he would not have had the opportunity to view the broadcast – and, thus, become aware of this technical malfunction – prior to making that comment, unless he had illicitly accessed the information in real time, with the aid of one or more confederates.

136.     During this hand, in which only two (2) of each player's four (4) Hole Cards were captured by the RFID Table, Mr. Postle can be seen repeatedly looking at his cellular telephone under the table and endeavoring to spread all four (4) of his Hole Cards over the RFID Table's censor, in a deliberate and highly unusual manner; his demeanor throughout the hand is exceedingly strange, and it is manifest this technical malfunction (which, in turn, denies him the ability to play the hand with knowledge of his opponents' Hole Cards) is distressing to Mr. Postle even though the malfunction is one of which he would have no real time knowledge if he was not engaged in fraudulent cheating behavior.

137.    Following the subject hand, Mr. Postle was interviewed by the Commentator and during said interview Mr. Postle asked (nearly immediately upon arriving in the Commentator's booth), "so what happened on that PLO hand where it only showed two of our cards?"

138.    "PLO" is shorthand for "pot limit Omaha," a game in which players are dealt four (4) Hole Cards; in contrast, during Texas hold 'em (the predominant game on Stones Live Poker), players are only dealt two (2) cards.

139.    The RFID Table malfunctioned transitioning from Texas hold 'em to pot limit Omaha during the May 3, 2019 game (the two games were played on a rotation on that given Stones Live Poker broadcast), and thusly only displayed two (2) of the players' Hole Cards in a pot limit Omaha hand where players were dealt four (4) cards.

140.    This is what caused Mr. Postle confusion while playing the subject hand; he could not view the entirety of every other player's Hole Cards on his phone, in his lap, and thus had to actually play a hand without omniscient knowledge of his opponents' holdings.

141.    Mr. Postle could not have known of the malfunction unless he was viewing the RFID Table's feed – on his phone, in his lap – in real time; yet his question to the Commentator – "what happened on that PLO hand where it only showed two of our cards" – immediately following his leaving the game, shows he did, in fact, have knowledge of the malfunction in real time.

142.    While there are a handful of Stones Live Poker sessions in which Mr. Postle did not make money, and in which he played in a sub-optimal manner, the Plaintiffs have information and a belief that such sessions correlate to the absence of Mr. Postle's suspected chief confederate, John Doe 1.



143.   Additionally, Mr. Postle's participation in Stones Live Poker games was uncharacteristically rare – in contrast to his normal schedule – when the person the Plaintiffs believe to be John Doe 1 was absent from the Sacramento area.

144.   Further, in the Stones Live Poker sessions where Mr. Postle played in a sub-optimal manner, he did not habitually stare at his lap, tended to keep his cellular telephone in plain view (ie, not concealed between his legs), and evidenced the sort of mediocre poker analytical and decision-making skills indicative of a rather average (if not below-average) player.

145.   These "honest" sessions actually function as evidence of Mr. Postle's cheating in and of themselves, as rather than serving to merely break his unworldly statistical trends, they act as a makeshift "placebo" in which Mr. Postle behaves differently, plays differently, and makes frequently-horrendous game-centric decisions when not imbued with the ability to utilize his cellular telephone for cheating purposes.

### General Allegations: Coverup

146.   On multiple occasions, when Mr. Postle's play of a given poker hand could not be explained through any point of strategy or style, and was instead heavily suggestive of cheating, one or more agents of Stones would announce his cards, as displayed on viewers' screens, were errant, and on at least one occasion the image would then "correct" the cards to suggest he was holding a different hand.

147.   This occurred, among other times, on February 9, 2019, in the Stones Live Poker game, when Mr. Postle made an inexplicable decision to bet almost Five Thousand Dollars ($5,000.00) into a pot, against an opponent's wager of Two Thousand Four Hundred Dollars ($2,400.00), despite Mr. Postle having a hand of "eight high" (one of the worst possible holdings in Texas hold 'em).

FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 24

148.    Mr. Postle's action in this situation induced his opponent to fold, thus ensuring Mr. Postle won the hand; in and of itself, this is neither extraordinary nor even noteworthy, as bluffing is part and parcel of poker.

149.    Mr. Postle's play in this situation, however, would necessarily have invited questions as to his strategy, as it was particularly reckless in nature and of the sort of variety likely to beget viral scrutiny on the internet.

150.    So as to avoid such, immediately following the hand, Stones changed the graphic showing his Hole Cards, and the Commentator announced an error to have occurred, with the new graphic suggesting Mr. Postle to have held a straight (one of the best hands in Texas hold 'em).

151.    For various technical reasons, it is not possible for the RFID Table to have misread Mr. Postle's cards only when they were dealt to Mr. Postle; if a misread was to occur, it would chronically follow the same precise cards of the deck when dealt to any player in the game, in any hand of poker in that given game.

152.    Further, even if a so-called misread could have occurred, it is technically impossible for the same to have been "detected" during the subject poker hand; even if the RFID Table erred (which it could not have in this context), the RFID Table would not have the ability to then promptly detect its own error, and there are no other instrumentalities through which any such feigned error could have been brought to the attention of Stones' production team.

153.    On every occasion where there was a "misread" of Mr. Postle's hand in such an instance, the "corrected" cards served to make more plausible Mr. Postle's behavior in the given hand; never did such serve to make Mr. Postle's play of the hand less plausible.



154.    These faux corrections were part of a pattern and practice, on the part of Stones through its agent(s), to conceal Mr. Postle's cheating from the public.

155.    Commencing at least as early as February 2019, numerous individuals approached Mr. Kuraitis to indicate the play of Mr. Postle on Stones Live Poker can only be attributed to cheating or, at minimum, is strongly indicative of the presence of cheating.

156.    Specifically, an out-of-town poker player ("Player 1") approached Mr. Kuraitis, at Stones' eponymous facility, in person, standing in front of a podium behind the Stones Live Poker table from which Mr. Kuraitis would normally watch game broadcasts, in February 2019, and informed Mr. Kuraitis of concerns about the integrity of an individual's play in the Stones Live Poker streams.

157.    Mr. Kuraitis responded to Player 1 by indicating Mr. Kuraitis was aware of the concerns, had heard them elsewhere, and was taking appropriate steps to ensure the integrity of the Stones Live Poker games.

158.    The Plaintiffs are aware of the identity of Player 1 and will reveal the same in discovery; he is not named herein solely to protect him from public scrutiny, but should this Honorable Court find Player 1 must be named to satisfy the pleading rigors of the Federal Rules of Civil Procedure, the Plaintiffs are prepared to amend this Complaint to name Player 1.

159.    Specifically, Ms. Brill approached Mr. Kuraitis on March 20, 2019, at Stones' eponymous facility, and notified him of her concerns Mr. Postle was cheating in Stones Live Poker games.

160.    Mr. Kuraitis responded to Ms. Brill by insisting the Stones Live Poker game is "one hundred percent secure," claiming there is no possibility of anyone cheating, asserting there to be an outside agency that audits the Stones Live Poker stream every three (3) months,



FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 26

declaring that Mr. Postle is simply a "fearless player" who uses a "Martingale strategy" to win at poker, and alleging Mr. Postle's play is so unique as to be incomprehensible to professional poker players.

161.    These assertions by Mr. Kuraitis, on behalf of Stones, were demonstrably counterfactual in nature.

162.    For various reasons related to the structure of poker games, it is impossible to apply a so-called "Martingale strategy" to a game of poker.

163.    It does not appear Stones was actually having external audits completed of its Stones Live Poker operations every three (3) months, or such audits would have resulted in Mr. Postle's cheating being detected (unless such audits were grossly incompetent); Stones has not identified any such external audits in connection with its now-false promise to conduct an investigation and make the results public.

164.    Indeed, Mr. Kuraitis repeatedly told multiple persons Mr. Postle was not cheating but, to the contrary, Mr. Postle's play is simply "on a different level" or he is "just on a heater" and his play is not something that can be explained.

165.    Further, Mr. Kuraitis told multiple persons Stones conducted a thorough investigation into the matter and such did not reveal the presence of cheating.

166.    On September 29, 2019, Stones – through its @StonesLivePoker Twitter handle – responded to allegations of cheating on the part of Mr. Postle by writing, *inter alia*, "We conducted a full investigation & found no evidence that any cheating had occurred," going on to write, in response to public allegations then made by Ms. Brill, "The recent allegations are completely fabricated."



167.    It is not clear how a "full investigation" could have been carried out by Stones prior to September 29, 2019; none of the Plaintiffs herein – all persons who played on Stones Live Poker with Mr. Postle – were ever approached or interviewed in furtherance of such an investigation and, upon information and belief, neither was Mr. Postle.

168.    To the contrary, if an investigation was undertaken (and the Plaintiffs do not know if one was or one was not), the same would necessarily not have been a "full" investigation in any normative sense of the term.

169.    Rather, when suspicions and concerns about Mr. Postle's play began to be raised, Stones – through Mr. Kuraitis and others – sought to quell such by giving false assurances a "full" investigation was undertaken, by playing up Mr. Postle as a deity-like figure through the introduction of certain graphics on the Stones Live Poker broadcast, and by telling players they simply did not understand Mr. Postle's immensely talented play.

170.    By taking these concerted actions, Stones was able to prolong the period of time in which Mr. Postle cheated other poker players out of their money, was able to elongate Mr. Postle's fraudulent conduct, and was able to allow for the further enrichment of Mr. Postle and his confederate(s).

171.    Only after Ms. Brill made public her suspicions, and the poker community at large responded by carrying out a series of *ad hoc* investigations through utilization of footage of old Stones Live Poker broadcasts, did Stones suspend the Stones Live Poker broadcast and announce the launching of an "independent investigation team."

172.    However, even in announcing an "independent investigation team," Stones continued its pattern and practice of misleading the public, as the individual Stones publicly designated as heading such team – Michael Lipman – is, in fact, an attorney who has previously



represented Stones in connection with gaming matters, who has also served as personal counsel to one or more of Stones' principles, and who – as recently as October 6, 2019 – Stones has referred to as its "outside counsel;" in short, while very much a respected and able attorney, Mr. Lipman is most certainly not "independent" of Stones.

### General Allegations: Mr. Postle's Employment by Stones

173.    After being notified Mr. Postle was engaging in cheating activities on the Stones Live Poker streams, and after falsely assuring persons to the contrary, Stones elected to engage Mr. Postle to host multiple special Stones Live Poker shows of his own, known as "Postle and Pals!" broadcasts.

174.    Upon information and belief, Stones agreed to – and actually did – compensate Mr. Postle for hosting these "Postle and Pals!" shows, on at least May 4, 2019 and June 1, 2019.

175.    Mr. Postle was an employee of Stones, for purposes of hosting – and playing in – these "Postle and Pals!" games, within the prism of California law, as he was not free from the control and direction of Stones in carrying out this work.

176.    Specifically, Stones dictated where Mr. Postle was to host the "Postle and Pals!" shows (at Stones' eponymous facilities), when he was to do so (on the dates indicated by Stones), and what he was to do (play poker on a broadcast at the RFID Table).

177.    The Plaintiffs believe there may have been additional "Postle and Pals!" games for which Mr. Postle was playing – and cheating – in his capacity as an employee of Stones, and/or other Stones Live Poker broadcasts for which he was employed by Stones even if the airings were not given his titular nomenclature; the details of such would be known to Stones and Mr. Postle, and can be learned in discovery herein.



178.    It does not, however, appear Stones hired Mr. Postle to begin hosting Stones Live Poker games, on the Stones payroll, until *after* Stones was made aware of his cheating behavior.

179.    Stated otherwise, Stones responded to being notified of Mr. Postle's cheating not by conducting a proper investigation or banishing him from its premises but, rather, by making him an employee.

**General Allegations: Mr. Postle and Stones' Structuring of Financial Transactions**

180.    As Mr. Postle won monies through his strategic cheating of Stones Live Poker games, he often ended certain gaming sessions with casino chips valued in excess of Ten Thousand Dollars and No Cents ($10,000.00).

181.    In contravention of the federal prohibition on structuring financial transactions to evade financial reporting requirements, Mr. Postle, on multiple occasions, utilized chip runners, employed by Stones, to cash out his chips in sums less than Ten Thousand Dollars and No Cents ($10,000.00), so no single transaction would exceed the reporting threshold set forth in Section 1021.313 of Title 31 of the Code of Federal Regulations.

182.    Stones was aware Mr. Postle was leaving its casino with monies in excess of the requisite reporting threshold (as its own employees documented his monies as part of the Stones Live Poker broadcasts, and as its own chip runners – also employees of Stones – were instrumental in this structuring scheme), yet nonetheless permitted Mr. Postle to engage in this illegal behavior.

183.    While none of the Plaintiffs herein are directly impacted by this illegality (except in some *de minimis* regard as taxpayers, for which they feign no standing), it is demonstrative of the wanton disregard for governing law employed by both Stones and Mr. Postle as he cheated

Stones Like Poker games at the direct expense of the Plaintiffs, and as Stones built up his image for its own economic and promotional purposes.

### General Allegations: Rake Damages

184.    At all times relevant, Stones collected a rake from every hand of poker in which Mr. Postle participated while cheating the Plaintiffs herein.

185.    The rake was collected by Stones, from the Plaintiffs, as and for Stones' operation of an honest, legal, regulated poker game, complete with sufficient security.

186.    Stones profited off the rake it collected, totaling tens of thousands of dollars during the life of Mr. Postle's scheme.

187.    The Plaintiffs would not have played in the Stones Live Poker games – and, ergo, paid the rake to Stones for operating those games – had they known (i) Mr. Postle was cheating; (ii) Stones was ignoring reports of Mr. Postle cheating; (iii) Stones and Mr. Postle were jointly engaged in illegal structuring activity; (iv) Stones security did not protect the integrity of the games being dealt; and/or (v) Stones was manipulating graphics and taking other steps so as to cover up for Mr. Postle's criminal cheating conduct.

### General Allegations: Loss Damages

188.    During the course of the events alleged herein, Mr. Postle profited more than Two Hundred Fifty Thousand Dollars ($250,000.00) from his play on Stones Live Poker.

189.    Each of the Plaintiffs herein played on Stones Live Poker with Mr. Postle and contributed chips to one or more pots in which he played.

190.    Most of the Plaintiffs herein lost money in one or more Stones Live Poker sessions in which they played with Mr. Postle, and Mr. Postle won such money from most of the Plaintiffs herein.

191.    Mr. Postle would not have won such money if he was not cheating.

192.    Every one of the Plaintiffs herein was deprived of the opportunity to maximize her or his respective profits in an honest poker game, while playing on Stones Live Poker, because of the conduct alleged herein.

193.    Many of the Plaintiffs herein derive part or all of their living from the play of poker, and have had their confidence in the integrity of the game greatly compromised by Mr. Postle's cheating and Stones' allowance of such cheating.

**General Allegations: Live Stream Security**

194.    Operating a livestream – using a device like the RFID Table – does not have to be, and should not be, a security risk.

195.    Numerous poker rooms have operated RFID-based live streams for several years, without any known instances of cheating having occurred by reason of manipulation of such RFID technology.

196.    By way of anecdote only, one casino in Los Angeles was an early pioneer in operating an RFID-based live stream and still utilizes it to broadcast widely-viewed cash poker games, four (4) to five (5) nights per week, through the present; the security and integrity of such casino's streaming operation is not readily subject to meaningful or well-reasoned challenge.

197.    Stones, however, utilized an appreciably more lackadaisical approach to security with its Stones Like Poker stream, allowing the room in which concealed information is reviewed in real time (the "Production Room") to be readily accessible by numerous people; by not constructing a proper security perimeter around the Production Room; by allowing the use of cellular telephones in the Production Room, during Stones Live Poker streams; and otherwise.



198.     Not only does this case not challenge the permissibility of undertaking a live poker stream but, to the contrary, this case is premised, in large part, upon the understanding that such live poker streams can – and should – be carried out in a secure and intelligent fashion, and that Stones was grossly negligent in not even feigning compliance with prevailing industry norms and standards for such an operation.

**Count I – Violation of the Racketeer Influenced and Corrupt Organizations Act**

**As Codified at Section 1962(c) of Title 18 of the United States Code**

**As Against Mr. Postle, John Does 1-10, and Jane Does 1-10**

199.     The Plaintiffs repeat and reallege each and every foregoing paragraph of this Complaint, as though fully set forth herein.

200.     Mr. Postle, John Does 1-10, and Jane Does 1-10, "devised … [a] scheme or artifice to defraud, or for obtaining money … by means of false or fraudulent pretenses, [and] representations," in furtherance of which they did "transmit[] or causes to be transmitted by means of wire … communication in interstate or foreign commerce, … signals, pictures, or sounds for the purpose of executing such scheme or artifice," in contravention of Section 1343 of Title 18 of the United States Code.

201.     Specifically, Mr. Postle, John Does 1-10, and Jane Does 1-10 used one or more instrumentalities of wire transmissions to relay to Mr. Postle, while playing in the Stones Live Poker games, information concerning the concealed card holdings of other players in the game, with such being transmitted for the express purpose of aiding Mr. Postle in a scheme to make money from such other players by fraudulently cheating in such game; Mr. Postle, John Does 1-10, and Jane Does 1-10, working together, directed the scheme.

FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 33



202.    Based on a review of video footage of several Stones Like Poker games, this scheme to defraud involved transmitting to Mr. Postle, via his cellular telephone, information concerning the concealed cards of other players, on multiple occasions.

203.    The specific mechanism(s) through which such information was fed to Mr. Postle by John Does 1-10 and Jane Does 1-10 is known only to them as of the filing of this Complaint, and will be learned through discovery herein; the Plaintiffs do, however, have information sufficient to specifically allege wire communications to have been sent to Mr. Postle's telephone, know such transmissions occurred during Stones Live Poker games, to allege such transmissions were made for purposes of defrauding the Plaintiffs (and others), and to allege such transmissions contained information concerning the concealed cards of the Plaintiffs (and others).

204.    The actions alleged in this Count I all occurred after Mr. Postle, John Does 1-10, and Jane Does 1-10 devised a scheme to defraud individuals – including the Plaintiffs – by having Mr. Postle cheat while playing in Stones Live Poker games.

205.    The fraudulent conduct alleged in this Count I occurred on at least the following dates:

      i.     July 18, 2018

      ii.    July 30, 2018

     iii.    August 1, 2018

     iv.    August 3, 2018

      v.    August 6, 2018

     vi.    August 10, 2018

     vii.   August 15, 2018

FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 34



viii.    August 22, 2018

ix.    August 29, 2018

x.    September 5, 2018

xi.    September 15, 2018

xii.    September 24, 2018

xiii.    September 26, 2018

xiv.    October 10, 2018

xv.    October 17, 2018

xvi.    October 19, 2018

xvii.    October 20, 2018

xviii.    October 24, 2018

xix.    October 29, 2018

xx.    November 7, 2018

xxi.    November 21, 2018

xxii.    November 26, 2018

xxiii.    November 28, 2018

xxiv.    December 5, 2018

xxv.    December 12, 2018

xxvi.    December 16, 2018

xxvii.    December 17, 2018

xxviii.    January 2, 2019

xxix.    January 7, 2019

xxx.    January 9, 2019

FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 35



xxxi.   January 12, 2019

xxxii.   January 14, 2019

xxxiii.   January 16, 2019

xxxiv.   January 19, 2019

xxxv.   January 30, 2019

xxxvi.   February 9, 2019

xxxvii.   February 16, 2019

xxxviii.   February 25, 2019

xxxix.   February 27, 2019

xl.   March 9, 2019

xli.   March 13, 2019

xlii.   March 16, 2019

xliii.   March 18, 2019

xliv.   March 23, 2019

xlv.   March 25, 2019

xlvi.   April 8, 2019

xlvii.   April 20, 2019

xlviii.   April 22, 2019

xlix.   April 30, 2019

l.   May 2, 2019

li.   May 3, 2019

lii.   May 4, 2019

liii.   May 8, 2019



liv.    May 13, 2019

lv.    May 18, 2019

lvi.    May 20, 2019

lvii.    July 20, 2019

lviii.    July 22, 2019

lix.    July 31, 2019

lx.    August 3, 2019

lxi.    August 5, 2019

lxii.    August 7, 2019

lxiii.    August 14, 2019

lxiv.    August 17, 2019

lxv.    August 21, 2019

lxvi.    September 9, 2019

lxvii.    September 18, 2019

lxviii.    September 21, 2019

206.    The Plaintiffs are in possession of records requisite to identify the individual participants in the Stones Like Poker games on each of the foregoing dates; this information is known to Stones and readily available to Mr. Postle (who participated in each such game and who has online access to complete footage of each such game). The Plaintiffs refrain from listing such information in this Complaint solely in the interest of keeping an already-lengthy pleading from becoming overly voluminous, however to the extent this Honorable Court believes such allegations should be included herein so as to comply with governing pleading rigors, the Plaintiffs are prepared to amend this Complaint to include such specific information.

FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 37



207.    The fraudulent conduct alleged in this Count I was carried out at Stones' eponymous facility in Citrus Heights, California.

208.    The fraudulent conduct alleged in this Count I was carried out by Mr. Postle and his "enterprise," as defined *infra*.

209.    The fraudulent conduct alleged in this Count I consists of Mr. Postle's cheating, as alleged *passim*.

210.    The fraudulent conduct alleged in this Count I was accomplished through the use of a cellular telephone, as described *supra*.

211.    Mr. Postle, John Does 1-10, and Jane Does 1-10 did constitute an "enterprise," as that term is defined in Section 1961(4) of Title 18 of the United States Code, at all times relevant.

212.    While the Plaintiffs do not know how many persons participated in such "enterprise," and will need discovery to learn such information as it is uniquely known to the Defendants as of present, the Plaintiffs do specifically allege Mr. Postle had at least one confederate, that such confederate – John Doe 1 – is the individual who caused to be transmitted to Mr. Postle the information concerning other players' Hole Cards during Stones Live Poker games, and that such confederate also took steps to allay suspicions and concerns regarding Mr. Postle's cheating so as to allow the same conduct to continue in an unabated manner for a protracted period of time in excess of one (1) year.

213.    The actions of Mr. Postle, John Doe 1, and Mr. Postle's other confederate(s) did constitute a "pattern of racketeering activity," as that term is defined in Section 1961(5) of Title 18 of the United States Code, as individual acts of wire fraud occurred on at least sixty eight (68)



separate occasions, correlating to every time Mr. Postle cheated in a Stones Live Poker game throughout the calendar years 2018 and 2019.

214.    The Plaintiffs' property interests have been damaged through the racketeering conduct set forth herein, as each has been deprived of monies – or the opportunity to win monies in an honest poker game – by reason of the racketeering conduct.

215.    Specifically, most Plaintiffs have lost money to Mr. Postle, in cheated hands of poker, that would not have been lost but for Mr. Postle cheating.

216.    Specifically, most Plaintiffs would have derived winnings from hands of poker but for their inability to do so as a result of Mr. Postle cheating.

217.    Specifically, all Plaintiffs paid a rake for operation of a fair, secure and honest poker game, of which they were deprived by Mr. Postle's cheating.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in favor of each Plaintiff, individually, and against Mr. Postle, John Does 1-10, and Jane Does 1-10, jointly and severally, in an amount equal to three times the damages suffered by each individual Plaintiff, pursuant to the allowances of Section 1964(c) of Title 18 of the United States Code; (ii) award each Plaintiff his or her respective attorneys' fees and suit costs incurred in connection with this action, and reduce the same to judgment in favor of each Plaintiff individually, with each such judgment being jointly and severally against Mr. Postle, John Does 1-10 and Jane Does 1-10, pursuant to the allowances of Section 1964(c) of Title 18 of the United States Code; and (iii) afford such other and further relief as may be just and proper.



**Count II – Fraud**

**As Against Mr. Postle, John Does 1-10, and Jane Does 1-10**

218.     The Plaintiffs repeat and reallege each and every foregoing paragraph of this Complaint, as though fully set forth herein.

219.     Mr. Postle and his confederate(s) implicitly represented to all players participating in Stones Live Poker games that Mr. Postle is a fellow honest participant in such games.

220.     This representation was false, as Mr. Postle and his confederate(s) were utilizing various wire communication facilities to permit Mr. Postle to cheat in such games.

221.     Mr. Postle and his confederate(s) had knowledge of the falsity of these representations, as their own overt conduct was required to carry out the fraud alleged herein.

222.     Mr. Postle and his confederate(s) made these implicit representations with the intent to defraud others by inducing their play in Stones Live Poker games where Mr. Postle could then take their money.

223.     The Plaintiffs herein justifiably relied on these fraudulent representations, electing to wager their own hard-earned money in Stones Live Poker games believing such to be honest and fair contests.

224.     The Plaintiffs herein have been damaged both in the form of monies lost to Mr. Postle in such Stones Live Poker games, monies paid to Stones as and for the rake, and, too, the loss of opportunity to earn monies through honest games of poker broadcast to the viewing public on a stream.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in favor of each Plaintiff, individually, and against Mr. Postle, John Does 1-10, and Jane Does 1-10, jointly and severally, in an amount equal to the damages suffered by each individual Plaintiff; (ii)



enter judgment favor of each Plaintiff, individually, and against Mr. Postle, John Does 1-10, and Jane Does 1-10, jointly and severally, as and for punitive damages, in the sum of Ten Million Dollars and No Cents ($10,000,000.00), divided *pari passu* between and amongst the Plaintiffs in proration to the number of minutes they spent playing on the Stones Like Poker broadcast from July 18, 2018 through the present; and (iii) afford such other and further relief as may be just and proper.

### Count III – Negligent Misrepresentation

**As Against Mr. Postle, Stones, Mr. Kuraitis, John Does 1-10, and Jane Does 1-10**

225.    The Plaintiffs repeat and reallege each and every foregoing paragraph of this Complaint, as though fully set forth herein.

226.    The Defendants implicitly and explicitly herein represented the Stones Live Poker games to be honest poker games monitored and effectively regulated by a licensed gaming operator in full compliance with California law.

227.    Mr. Postle did so through the conduct alleged *supra* in Count II of this Complaint.

228.    Mr. Kuraitis – individually and as an agent of Stones – did so when he allayed suspicions of cheating by telling people Mr. Postle's play of poker was simply on "a different level," and that Mr. Postle is "on a heater," while also telling at least one Plaintiff that Stones undertakes a quarterly security audit of its Stones Live Poker system and assuring multiple Plaintiffs that Stones had investigated Mr. Postle's play and cleared him.

229.    Stones also made this representation implicitly by conducting Stones Live Poker games in a licensed casino, wherein there exists an implicit representation players are protected from the cheating of other players through utilization of adequate and sufficient security measures and protocols.



230.    These representations were untrue, as Mr. Postle was cheating in the Stones Live Poker games from at least July 2018 onward.

231.    Mr. Postle made this representation without a reasonable basis for believing it to be true, inasmuch as he personally knew of his own cheating conduct.

232.    Stones and Mr. Kuraitis made these representations without a reasonable basis for believing them to be true, as they continuously concealed allegations of cheating on the part of Mr. Postle, and failed to supervise the Stones Live Poker with adequate and sufficient security.

233.    Stones also knew this representation to be untrue because at least one agent of Stones served as a John Doe or Jane Doe confederate of Mr. Postle in aiding him with carrying out his scheme to defraud other poker players.

234.    These representations were universally made with an intent to induce reliance on the part of the Plaintiffs in the form of having the Plaintiffs continue to play in the Stones Live Poker games.

235.    The Plaintiffs did detrimentally rely on these representations by continuing to play in the Stones Live Poker games.

236.    The Plaintiffs herein have been damaged both in the form of monies lost to Mr. Postle in such Stones Live Poker games, in the form of monies paid to Stones as and for the rake, and, too, the loss of opportunity to earn monies through honest games of poker broadcast to the viewing public on a stream.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in favor of each Plaintiff, individually, and against Mr. Postle, Stones, Mr. Kuraitis, John Does 1-10, and Jane Does 1-10, jointly and severally, in an amount equal to the damages suffered by each individual Plaintiff; and (ii) afford such other and further relief as may be just and proper.



**Count IV – Negligence Per Se**

**As Against Mr. Postle, John Does 1-10, and Jane Does 1-10**

237.    The Plaintiffs repeat and reallege each and every foregoing paragraph of this Complaint, as though fully set forth herein.

238.    Mr. Postle and his confederate(s) "devised … [a] scheme or artifice to defraud, or for obtaining money … by means of false or fraudulent pretenses, [and] representations," in furtherance of which they did "transmit[] or causes to be transmitted by means of wire … communication in interstate or foreign commerce, … signals, pictures, or sounds for the purpose of executing such scheme or artifice," in contravention of Section 1343 of Title 18 of the United States Code.

239.    This violation of controlling law, on the part of Mr. Postle and his confederates, has caused the Plaintiffs to suffer damages in the form of monies lost to Mr. Postle in Stones Live Poker games, monies paid to Stones as and for the rake, and, too, the loss of opportunity to earn monies through honest games of poker broadcast to the viewing public on a stream.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in favor of each Plaintiff, individually, and against Mr. Postle, John Does 1-10, and Jane Does 1-10, jointly and severally, in an amount equal to the damages suffered by each individual Plaintiff; and (ii) afford such other and further relief as may be just and proper.

**Count V – Unjust Enrichment**

**As Against Mr. Postle**

240.    The Plaintiffs repeat and reallege each and every foregoing paragraph of this Complaint, as though fully set forth herein.



241.    Mr. Postle won monies from the Plaintiffs through his cheating on the Stones Live Poker broadcasts.

242.    It is unjust for Mr. Postle to retain such illicit winnings when they should, as a matter of fact and law alike, be returned to the Plaintiffs.

243.    A failure on the part of Mr. Postle to return these winnings will result in his being unjustly enriched to the detriment of the Plaintiffs.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in favor of each Plaintiff, individually, and against Mr. Postle, in an amount equal to the damages suffered by each individual Plaintiff; and (ii) afford such other and further relief as may be just and proper.

### Count VI – Negligence

### As Against Stones and Mr. Kuraitis

244.    The Plaintiffs repeat and reallege each and every foregoing paragraph of this Complaint, as though fully set forth herein.

245.    As the director of Stones Live Poker, Mr. Kuraitis – individually and as an agent of Stones – had a duty to ensure the game was carried out in a manner reasonably free of cheating, and to take reasonable steps to detect and stop any cheating from occurring.

246.    Mr. Kuraitis, as a key employee in his capacity as director of Stones Live Poker – individually and as an agent of Stones – had a duty to ensure the game was carried out in a manner reasonably free of cheating, and to take reasonable steps to detect and stop any cheating from occurring, as mandated by Section 19801, *et seq.* of the California Business and Professions Code (the "Gambling Control Act").

FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 44



247.   Mr. Kuraitis breached this duty by not adequately investigating allegations of cheating on the part of Mr. Postle, not following such allegations with an objective examination of Mr. Postle's play (which would have confirmed the presence of cheating), and allowing Mr. Postle to remain in the Stones Live Poker games.

248.   Further, Stones had a duty to the public to abide by the "strict and comprehensive regulation of all persons, … practices, associations, and activities related to the operation of lawful gambling establishments […]," as mandated by Section 19801(h) of the Gambling Control Act.

249.   Stones breached this duty by maintaining a control room that did not adhere to prevailing industry standards for security.

250.   Stones breached this duty by not properly regulating and/or supervising Mr. Kuraitis in his capacity as a key employee in a way that would protect the public from reasonably foreseeable harm.

251.   These breaches have caused the Plaintiffs to sustain damages, as they each continued to play in poker games in which criminal fraud was being carried out; they each either lost money, or lost the opportunity to maximize profit, in such games; and they have each had their confidence in the fairness of poker games disrupted and disturbed.

252.   The Plaintiffs have each been damaged in an amount equal to their pro rata share of the monies Mr. Postle won, as well as in a sum equal to other losses they sustained by playing in a fraudulent poker game, as well as in a sum equal to monies they paid to Stones as and for the rake.



253.     For the avoidance of doubt, the Plaintiffs do *not* claim to bring a private cause of action for violation of the Gambling Control Act; citations thereto herein are merely for purposes of establishing one of the duties of care owed by Stones and Mr. Kuraitis to the Plaintiffs.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court enter judgment in each of their favor, individually, and against Mr. Kuraitis and Stones, jointly and severally, in a sum equal to the damages they have each sustained as a result of the negligence of Stones and Mr. Kuraitis; and for such other and further relief as may be just and proper.

### Count VII – Constructive Fraud

### As Against Stones

254.     The Plaintiffs repeat and reallege each and every foregoing paragraph of this Complaint, as though fully set forth herein.

255.     Stones had a legal duty to monitor the Stones Live Poker game for cheating and to take reasonable steps and measures to prevent the occurrence of cheating therein.

256.     This duty was owed to the Plaintiffs as players in the Stones Live Poker game.

257.     Stones breached this duty by concealing from the Plaintiffs allegations of cheating and fraud on the part of Mr. Postle.

258.     Stones breached this duty by allaying the suspicions of certain Plaintiffs with false assurances of a thorough investigation and quarterly audits being undertaken.

259.     Stones breached this duty by maintaining a control room that did not adhere to prevailing industry standards for security.

260.     The Plaintiffs herein have been damaged both in the form of monies lost to Mr. Postle in such Stones Live Poker games, monies paid to Stones as and for the rake, and, too, the

loss of opportunity to earn monies through honest games of poker broadcast to the viewing public on a stream.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in favor of each Plaintiff, individually, and against Stones, in an amount equal to the damages suffered by each individual Plaintiff; (ii) enter judgment favor of each Plaintiff, individually, and against Stones, as and for punitive damages, in the sum of Ten Million Dollars and No Cents ($10,000,000.00), divided *pari passu* between and amongst the Plaintiffs in proration to the number of minutes they spent playing on the Stones Like Poker broadcast from July 18, 2018 through the present; and (iii) afford such other and further relief as may be just and proper.

### Count VIII – Fraud

### As Against Stones and Mr. Kuraitis

261.    The Plaintiffs repeat and reallege each and every foregoing paragraph of this Complaint, as though fully set forth herein.

262.    Mr. Kuraitis, in his capacity as an employee and agent of Stones, expressly told Ms. Brill, Ms. Mills, and Mr. Goone (the "Stones Fraud Victims") there was no cheating in the Stones Live Poker broadcast.

263.    Mr. Kuraitis further informed the Stones Fraud Victims a thorough investigation of such cheating allegations had occurred or would be occurring.

264.    Mr. Kuraitis knew, or should have known, these representations to be false; had he reviewed the cumulative footage of Mr. Postle's play, it would have revealed cheating to be rampant, and it is not possible for any putative investigation carried out to have been thorough and such would have revealed the cheating underlying this Complaint.

FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 47



265.   The Stones Fraud Victims relied on these counterfactual representations in continuing to play on Stones Live Poker; had they known the game to be fraudulent, they would have declined to further participate in the game.

266.   The Stones Fraud Victims have been damaged by these representations in an amount equal to their pro rata share of the monies Mr. Postle won, as well as in a sum equal to other losses they sustained by playing in a fraudulent poker game, as well as in a sum equal to monies paid to Stones as and for the rake.

267.   The fraudulent representation made to the Stones Fraud Victims, by Mr. Kuraitis, while acting for himself and on behalf of Stones, are particularly outrageous, as they served to allow the continuation of the largest known fraud in the modern history of live poker.

WHEREFORE, the Stones Fraud Victims respectfully pray this Honorable Court (i) enter judgment in their favor, individually, and against Mr. Kuraitis and Stones, jointly and severally, in an amount equal to their pro rata share of the monies Mr. Postle won, as well as in a sum equal to other losses they sustained by playing in a fraudulent poker game; (ii) alternatively, enter judgment in their favor, individually, and against Mr. Kuraitis and Stones, jointly and severally, in an amount equal to the rake collected by Stones in all Stones Poker Live games enumerated herein (iii) enter judgment in their favor, individually, and against Mr. Kuraitis and Stones, jointly and severally, as and for punitive damages, in the sum of Ten Million Dollars and No Cents ($10,000,000.00), divided *pari passu* between and amongst the Stones Fraud Victims in proration to the number of minutes they spent playing on the Stones Like Poker broadcast from January 1, 2019 through the present; and (iv) afford such other and further relief as may be just and proper.

FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 48

**Count IX – Libel**

**As Against Stones**

268.     The Plaintiffs repeat and reallege each and every foregoing paragraph of this Complaint, as though fully set forth herein.

269.     After Ms. Brill made public her suspicions of Mr. Postle cheating on the Stones Live Poker broadcast, Stones responded by asserting, on a publicly-available social media account, *inter alia*, "The recent allegations are completely fabricated."

270.     This statement was and is demonstrably counterfactual; the precise allegations made by Ms. Brill – that there is anecdotal and circumstantial evidence to believe someone has been cheating on the Stones Live Poker broadcast – were truthful in nature, objective in nature, and genuine in nature.

271.     As a direct and proximate result of Stones accusing Ms. Brill of making "completely fabricated" allegations, Ms. Brill suffered bullying, harassment, and emotionally-taxing non-physical attacks on social media and elsewhere.

272.     While Ms. Brill was rapidly acquitted of this libelous statement by third party members of the poker community who made public their *ad hoc* investigations, she nonetheless suffered the emotional duress of having her integrity and reputation sullied for a period of days before such acquittal could be brought about by the mitigating efforts of third party individuals.

273.     Ms. Brill brings this Count IX solely to seek nominal damages, and in an effort to highlight Stones' efforts to coverup the criminal activity alleged *passim* as being so pervasive as to extend to libeling one of the individuals who played on the Stones Live Poker game; she does not seek any damages correlative to the mental toll such libelous conduct took on her, nor does



she seek any lost compensation nor any reputational damages, as the mitigation of Stones' conduct, by the poker community at large, has served to restore Ms. Brill's good name.

WHEREFORE, Ms. Brill respectfully prays this Honorable Court enter judgment against Stones, and in her favor, in the sum of One Thousand Dollars and No Cents ($1,000.00), and for such other and further relief as may be just and proper.

**Count X - Consumers Legal Remedies Act**

**As Against Stones**

274.     The Plaintiffs repeat and reallege each and every foregoing paragraph of this Complaint, as though fully set forth herein.

275.     In operating each of the Stones Live Poker games referenced *supra*, and collecting a rake in each such game as and for, *inter alia*, the provision of appropriate safeguards and security befitting a game played at an RFID Table, Stones represented it was furnishing services having the characteristic of being secure and honest in nature, in contravention of Section 1770(a)(5) of the California Civil Code.

276.     In operating each of the Stones Live Poker games referenced *supra*, and collecting a rake in each such game as and for, *inter alia*, the provision of appropriate safeguards and security befitting a game played at an RFID Table, Stones represented the Stones Like Poker games to be of an honest, secure, and safe quality and standard, featuring appropriate security protocols to prevent cheating through illicit utilization of the RFID Table, in contravention of Section 1770(a)(7) of the California Civil Code.

277.     Stones specifically represented to Ms. Brill it had investigated allegations of Mr. Postle's cheating, with such representation concerning the characteristic of a service (the Stones



Live Poker games) Stones was providing, in contravention of Section 1770(a)(5) of the California Civil Code.

278.    On February 15, 2020, the Plaintiffs, by and through counsel, transmitted to Stones, by and through counsel (via electronic mail), a demand for remediation of the damages flowing from these statutorily-proscribed practices, asking Stones to, *inter alia*, "identify and refund all players any and all monies lost in any hand in which Michael Postle participated, in any Stones Live poker game between July 18, 2019 and the present."

279.    This demand was later transmitted to Stones' counsel through certified mail.

280.    Stones has not complied with the Plaintiffs' demand.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in their favor, individually, and against Stones, in an amount equal to their pro rata share of the monies Mr. Postle won, as well as in a sum equal to other losses they sustained by playing in a fraudulent poker game, pursuant to the allowances of Section 1780(a)(1) of the California Civil Code; (ii) alternatively, enter judgment in their favor, individually, and against Stones, in an amount equal to the rake collected by Stones in all Stones Poker Live games enumerated herein, pursuant to the allowances of Section 1780(a)(1) of the California Civil Code; (iii) enter judgment in their favor, individually, and against Stones, as and for punitive damages, in the sum of Ten Million Dollars and No Cents ($10,000,000.00), divided *pari passu* between and amongst the Stones Fraud Victims in proration to the number of minutes they spent playing on the Stones Like Poker broadcast from January 1, 2019 through the present, pursuant to the allowances of Section 1780(a)(4) of the California Civil Code; (iv) award them their reasonably attorneys' fees and court costs in connection with this litigation, pursuant to the allowances of Section 1780(e)



of the California Civil Code; and (v) afford such other and further relief as may be just and proper.

**Count XI – Negligence Per Se**

**As Against Mr. Postle**

281.    The Plaintiffs repeat and reallege each and every foregoing paragraph of this Complaint, as though fully set forth herein.

282.    Section 337x of the California Penal Code provides, "It is unlawful to cheat at any gambling game in a gambling establishment."

283.    This provision is intended to protect players participating in games at California gambling establishments from such cheating.

284.    The Plaintiffs, as poker players engaged in poker games at Stones (a California gambling establishment), fall within the class of persons sought to be protected by this statute.

285.    Mr. Postle violated this statute by cheating in Stones Live Poker games, as alleged *passim*.

286.    The Plaintiffs have been damaged by these Mr. Postle's criminal conduct in an amount equal to their pro rata share of the monies Mr. Postle won, as well as in a sum equal to other losses they sustained by playing in a fraudulent poker game, as well as in a sum equal to monies paid to Stones as and for the rake.

WHEREFORE, the Plaintiffs respectfully pray this Honorable Court (i) enter judgment in favor of each Plaintiff, individually, and against Mr. Postle, in an amount equal to the damages suffered by each individual Plaintiff; and (ii) afford such other and further relief as may be just and proper.

**[JURY DEMAND AND SIGNATURE ON FOLLOWING PAGE]**



**Jury Demand**

Pursuant to, and in accordance with, the allowances of Federal Rule of Civil Procedure 38, the Plaintiffs pray a trial by jury on all matters so triable.

Dated this 25th day of March, 2020.

Respectfully Submitted,

**THE VERSTANDIG LAW FIRM, LLC**

By: /s/ Maurice B. VerStandig
Maurice B. VerStandig (*pro hac vice*)
1452 W. Horizon Ridge Pkwy, #665
Henderson, Nevada 89012
Telephone: (301) 444-4600
Facsimile: (301) 576-6885
mac@mbvesq.com
*Counsel for the Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 25th day of March, 2020, I caused a true and correct copy of the foregoing to be served upon the following persons via this Honorable Court's CM/ECF system:

Michael L. Lipman, Esq.
Karen Lehmann Alexander, Esq.
Duane Morris LLP
750 B Street
Suite 2900
San Diego, CA 92101
*Counsel for King's Casino, LLC*



FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 53

Heather U. Guerena, Esq.
Heather U. Guerena, Attorney at Law
7727 Herschel Avenue
La Jolla, CA 92037
*Counsel for King's Casino, LLC*

Mark Mao, Esq.
Boies Schiller Flexner LLP
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
*Counsel for King's Casino, LLC*

Richard Pachter, Esq.
Law Offices of Richard Pachter
555 University Avenue, Suite 200
Sacramento, CA 95825
*Counsel for Justin Kuraitis*

     I further certify that I have caused a true and accurate copy of the foregoing to be served

on the following person via United States Mail, postage prepaid:

Michael L Postle
3724 Deerwalk Way
Antelope, California 95843

/s/ Maurice B. VerStandig
Maurice B. VerStandig

FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY - 54

